**R. AMATULLI, et al., [Robert Davidson]**

v.

**PEOPLE'S BANK.**

Civ. No. 5:88–cv–568 (WWE).

United States District Court,
D. Connecticut.

Feb. 28, 1996.

Alan Neigher, Byelas & Neigher, Westport, CT, Steven J. Shore, Schwarzfeld, Ganfer & Shore, New York City, for plaintiffs.

Stefan Richard Underhill, James F. Stapleton, Craig Arthur Goldberg, Kenneth W. Ritt, Day, Berry & Howard, Stamford, CT, for People's Bank.

Alan Neigher, Byelas & Neigher, Westport, CT, Steven J. Shore, Schwarzfeld, Ganfer & Shore, New York City, for Mitra Huntley.

*RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT ON
COUNTERCLAIMS*

EGINTON, Senior District Judge.

Plaintiff, Robert Davidson, together with twenty-one other investors, brought this action against defendant, People's Bank, alleging fraud in connection with his investment in five limited partnerships. Defendant counterclaimed for judgment against plaintiff on the six promissory notes executed by plaintiff in connection with the investments.

Defendant moves for summary judgment on the promissory notes pursuant to Fed. R.Civ.P. 56. Plaintiff responded and a ruling on the motion was deferred until after further discovery was conducted. Plaintiff later filed a second memorandum in opposition to which defendant both replied and argued that plaintiff's federal securities law claims are time-barred. Plaintiff responded. For the following reasons, defendant's motion will be granted in part and denied in part. Count Two of the Second Amended Complaint will be dismissed on the Court's motion.

*BACKGROUND*

The pleadings, affidavits and other evidence reveal the following facts. Plaintiff executed a promissory note on December 30, 1983 whereby he promised to pay defendant the principal sum of $22,500 with interest on the unpaid principal. He executed a second note on August 13, 1984 whereby he promised to pay defendant the principal sum of $95,000 with interest on the unpaid principal; a third note on November 27, 1984 whereby he promised to pay defendant the principal sum of $69,375 with interest on the unpaid principal; a fourth note on December 11, 1984 whereby he promised to pay defendant the principal sum of $23,125 with interest on the unpaid principal; a fifth note on March 28, 1985 whereby he promised to pay defendant the principal sum of $47,500 with interest on the unpaid principal; and a sixth note on June 7, 1985 whereby he promised to pay defendant the principal sum of $47,500 with interest on the unpaid principal. He failed to make the September 1987 interest payments

and all subsequent payments on all of the notes.

Plaintiff executed the notes as part of his investment in five limited partnerships which were offered to finance research and development in Telentry Systems, Inc. ("Telentry"), a company involved in the development of computer technology. James D. Gershman was the founder of Telentry as well as its CEO/President throughout the entire period at issue.

### The First Limited Partnership— Telentry Research

On or about December 19, 1983, Robert Stark, a Vice President of defendant, prepared a Loan Presentation summarizing the proposed financing by defendant of the first Telentry limited partnership named Telentry Research Partners ("Telentry Research"). The Loan Presentation stated that the proposed transaction

> is based solely on the security offered and the opportunity to establish a substantial loan relationship with a growth company.... Mr. Gershman anticipates Telentry sales in excess of $50,000,000 in the first full fiscal year. A volume of this amount or near this amount will offer [defendant] the opportunity to rapidly expand this initial relationship.

It further stated that

> All documents for this credit facility will be drafted or reviewed by bank counsel, Pullman, Comley, Bradley & Reeves....

The transaction was approved by defendant's Executive Committee on December 22, 1983. Plaintiff alleges that the private placement offering memorandum stated that the purpose of the partnership was to fund a research and development contract worth $348,500 with Telentry that would enable Telentry to develop computer software known as "Telentry Universal Language System." An equal sum was to be maintained in a working capital reserve fund. On December 30, 1983, plaintiff signed a promissory note whereby he promised to pay defendant $22,500 with interest on the unpaid principal. The note does not indicate when it was delivered to defendant.

On or about December 30, 1983, defendant loaned $348,500 to Telentry Research and Telentry. The loan proceeds were credited by defendant to an account at defendant in the name of Telentry which was simultaneously pledged to defendant as collateral security for the loan to Telentry Research. Telentry opened an account with defendant sometime between December 1983 and February 1984. On or about March 2, 1984, defendant began managing the cash of Telentry by making investments for its accounts.

### The Second Limited Partnership— Telentry Development

On or about March 27, 1984, Stark prepared a Loan Presentation summarizing the proposed financing by defendant of the second Telentry limited partnership named Telentry Development Limited Partnership ("Telentry Development"). Defendant was to finance up to $5 million of limited partnership investments in Telentry Development by accepting promissory notes made payable directly to it from the limited partners. The Loan Presentation repeated the same bases for the loan that had been given in the presentation for the first partnership. The transaction was approved by defendant's Executive Committee on March 29, 1984.

On or about March 30, 1984, defendant made a $50,000 unsecured demand loan to Telentry. The note executed by Telentry in favor of defendant in connection with the loan stated that the purpose of the loan was to provide working capital. It was to be repaid out of Telentry's corporate income. A March 31, 1984 Loan Presentation states that the loan was to act as "window dressing" for Telentry's fiscal year that ended on March 31, 1984. Stark, at deposition, testified that the loan was made in order to appear on Telentry's balance sheet and that it was to "be repaid shortly thereafter."

On April 30, 1984, defendant made another $50,000 loan to Telentry secured by a pledge of a $50,000 passbook account at defendant in the name of Telentry. The loan was to be used for working capital and to be repaid out of Telentry's corporate profits.

The Telentry Development private offering memorandum, dated May 1, 1984, stated that the purpose of the investment was to fund Telentry Development's entry into a "turnkey" research and development contract with Telentry. It would enable Telentry to develop a marketable on-site single station computer hardware device called the "dataDRIVER" capable of utilizing software concurrently being developed by Telentry under contract with Telentry Research.

The memorandum provided that purchase of the units in the offering were to be made by each limited partner's payment of 5% of the unit price in cash and delivery of a promissory note to defendant for 95% of the unit price. It provided that the proceeds from the offering would be used as follows:

| | | |
|---|---|---|
| A. | To Pooled Nondiscretionary grantor Trust for Investors | $2,100,000 |
| B. | To Surety for Premium for Bonding of Each Investor | $ 178,000 |
| C. | To Telentry Development Limited Partnership, for application as follows: | |
| 1. | To fund the Telentry Research and Development Contract | $2,000,000 |
| 2. | For legal and accounting services and related contingencies | $ 50,000 |
| 3. | For (1) general partner financial management and advisory services (not to exceed $200,000); (ii) selling expenses (not to exceed $400,000); and (iii) the remainder in a miscellaneous expense reserve to pay ongoing expenses of the partnership | $ 662,500 |
| | Total Proceeds | $5,000,000 |

In or about May 1984, defendant agreed to finance a series of leases of computer equipment from Ralion Corporation, as lessor, to Telentry as lessee. The leases involved a non-recourse loan by defendant to Ralion in the amount of the purchase price of the computer equipment plus Ralion's fee, and the assignment by Ralion to defendant of the payments due from Telentry under the leases together with Ralion's security interest in the leased equipment. Prior to August 15, 1984, defendant financed a total of $197,446.81 worth of Ralion leases to Telentry.

On or about June 8, 1984, defendant made an unsecured loan to Telentry for $25,000. On or about August 3, 1984, it made another unsecured loan to Telentry for $100,000. The loan presentation for each indicates that each was personally guaranteed by Gershman and was to be repaid out of the proceeds of the closing of the Telentry Development limited partnership offering. A Loan Presentation dated July 31, 1984 in which Telentry requested a loan of $100,000, states that "all debt" will be repaid from the first Telentry Development closing scheduled for August 15, 1984. On or about August 7, 1984, Gershman authorized defendant to transfer funds between the bank accounts of Telentry, Telentry Research, Telentry Development, Gershman and another limited partnership venture in which Gershman had an interest.

On August 13, 1984, plaintiff executed a promissory note whereby he promised to pay defendant $95,000 plus interest on the unpaid principal. The note does not indicate when it was delivered to defendant. The first closing of the offering was on August 15, 1984. On or about August 31, 1984, defendant financed an additional $250,865 of Ralion leases which brought the total amount of Ralion leases financed by defendant to approximately $448,311.84. On or about September 19, 1984, after the final closing of Telentry Development, $225,000 was paid by Telentry to defendant to retire the prior loans made to Telentry.

### The Third Limited Partnership— Telentry XL

On or about October 24, 1984, Stark prepared a Loan Presentation that summarized the proposed financing by defendant of the third Telentry limited partnership financing vehicle to be named Telentry XL Limited Partnership ("Telentry XL"). The Loan Presentation stated that defendant would finance up to $2,375,000 of limited partnership investments in Telentry XL by accepting promissory notes made payable directly to defendant from the limited partners. The bases for the loan was described in exactly the same language as had been used to describe the first two presentations. It also provided that "all documents for this credit facility will be drafted or reviewed by bank counsel...."

The Telentry XL transaction was approved by defendant's Executive Committee on October 25, 1984. Plaintiff alleges that the private placement offering memorandum stated that the purpose of the investment was to fund Telentry XL's entry into a research and development contract with Telentry that would enable Telentry to develop a computer hardware software system designed to permit on-site translation and transmission interfacing between a large number of word processors and personal computers.

Purchases of the partnership units were to be made by the payment of 7.5% in cash and the delivery of a promissory note to defendant for 92.5% of the unit price. On November 27, 1984, plaintiff executed a promissory note whereby he promised to pay defendant $69,375 with interest on the unpaid principal. The note was delivered to defendant on December 4, 1984. Plaintiff executed a second note on December 11, 1984 for $23,125 that was delivered to defendant on December 14, 1984.

On November 30, 1984, defendant extended a ninety-day $600,000 letter-of-credit on behalf of Telentry to enable Telentry to purchase approximately 150 computers from Grid Systems, Inc. As security, defendant was assigned Gershman's interest in the proceeds of the sale of another venture in which he held an interest. Sometime in November, defendant also financed an additional $599,310.02 of Ralion leases, bringing the total amount of Ralion leases it financed to $1,047,621.86.

### The Fourth Limited Partnership— Telentry Research II

On January 31, 1985, Stark prepared a Loan Presentation summarizing the proposed financing by defendant of a fourth Telentry limited partnership vehicle named Telentry Research Limited Partnership II ("Telentry Research II"). It stated that defendant would finance up to $10 million of limited partnership investments by accepting promissory notes made payable directly to defendant from limited partners.

The transaction was approved by the Executive Committee. Plaintiff alleges that the private placement memorandum states that the purpose of the investment was to fund Telentry Research II's entry into a research and development contract with Telentry. Purchases were to be made by the payment in cash of 5% and the delivery of a promissory note to defendant for 95% of the unit price.

Plaintiff purchased partnership units and executed a promissory note on March 28, 1985 whereby he promised to pay defendant the principal sum of $47,500 with interest on the unpaid principal. The note was delivered to defendant on March 30, 1985.

On February 13, 1985, after the transaction was approved, defendant made a $250,000 unsecured demand loan to Telentry for working capital. The Loan Presentation states that the loan would be paid out of the second closing of the Telentry Research II limited partnership which was scheduled for March 31, 1985. It also states that the previously issued $600,000 letter-of-credit would be cancelled either by payment from the first closing of Telentry Research II, scheduled for February 26, 1985, or from Telentry's "own funds." The loan was repaid on May 1, 1985.

On or about March 13, 1985, after the first closing of the Telentry Research II partnership but prior to the second closing, defendant made a secured demand loan of $500,000 to Telentry for working capital. The Loan Presentation stated that the loan would be repaid out of the proceeds of the second Telentry Research II closing. The loan was repaid on April 3, 1985.

### The Fifth Limited Partnership— Telentry Development II

On May 9, 1985, Stark prepared a Loan Presentation summarizing the proposed financing by defendant of a fifth Telentry limited partnership to be named Telentry Development Limited Partnership II ("Telentry Development II"). It stated that defendant would finance up to $7,500,000 of limited partnership investments in the partnership in the same manner as it had done in the previous three partnerships. It also stated that the partnership loan "will be a fully

secured transaction with no credit risk to [defendant]" and that "Pullman–Comley (sic) will approve or draft all documentation."

The private offering memorandum, dated May 10, 1985, stated that the purpose of the investment was to fund a research and development contract with Telentry to enable it to develop a marketable computer hardware device called the "DataDRIVER 100". Purchases of partnership units were to be made by 5% cash and the delivery of a promissory note to defendant for 95% of the unit price. Plaintiff alleges and defendant denies, that the same September 30, 1984 financial statements that were included in the Telentry Research II offering memorandum were used again without an update.

Plaintiff purchased partnership units and signed a promissory note on June 7, 1985 whereby he promised to pay defendant the principal sum of $47,500 with interest on the unpaid principal. The note was delivered to defendant "as of" the same day.

Defendant made a $100,000 unsecured demand loan to Gershman on May 16, 1985, and a $250,000 unsecured demand loan to Gershman on May 24, 1985. Plaintiff alleges that both loans were used to fund Telentry's operations, including its payroll.

After the closing of Telentry Development II, defendant made further loans to Telentry and Gershman. The Loan Presentation for a $470,000 loan to Telentry dated October 25, 1985 stated that

> Analysis of the bank's position is identical to the position we were in with the last partnership loan [Telentry Development II]. After much consideration, it was determined that not to fund was the greater danger. By not funding [Telentry] would have failed which would have left our unsecured leases through Ralion Inc. exposed and with [Telentry]'s failure, the limited partners of the secured partnership loans the bank has would certainly begin numerous lawsuits.

The Loan Presentation for another loan dated October 31, 1985 stated that

> A failed [Telentry] endangers our loans on leases and would certainly precipitate massive delinquencies in the limited partner-

ship loans on the books not to mention the numerous law suits that would arise.

A letter dated January 21, 1986, from Grove Stoddard, counsel for Telentry Development II, stated that

> We noted in December when we first read the offering materials used to solicit investments in [Telentry Development II], what might possibly be inconsistencies between the representations therein and certain facts as we know them.

### The Note Modification Plan

Stark's employment with defendant was terminated in or about November 1985 for exceeding his authority in making loans to Telentry. In 1986, negotiations took place between representatives of defendant, representatives of some of the limited partners and the principals of a new corporation named Electronic Courier Systems, Inc. ("ECS") which was formed with the purpose of continuing the development of the Telentry technology despite the failure of Telentry. In the summer of 1986, defendant and ECS transmitted to each limited partner a note modification proposal and execution package with respect to such limited partner's promissory note obligations to defendant, a private offering memorandum and subscription agreement with respect to an offering of common stock of ECS, as well as certain other documents ("Note Modification Plan").

Defendant admits that its motivation for the Note Modification Plan was to avoid lengthy, costly litigation over the question of whether it had been involved in fraud at the time the partnerships were formed and to avoid the negative publicity that would result. Each limited partner who chose to accept the Plan was required to enter into a Release Agreement whereby the partner released defendant from claims arising out of defendant's dealings with the Telentry limited partnerships. Plaintiff agreed to the Plan.

The second amended complaint seeks declarations that the last five promissory notes are void and unenforceable due to the fact that each was an integral part of a limited

partnership investment which was fraudulent and in which defendant participated (Count One). With respect to Telentry Development and Telentry XL, it seeks damages on the grounds that defendant aided and abetted Telentry and Gershman in fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission (Count Two). With respect to Telentry Research II and Telentry Development II, it seeks damages on the grounds that defendant violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission (Count Three). With respect to all of the notes, the complaint seeks damages on the grounds that defendant conspired to violate the federal securities laws (Count Four); violation of Connecticut General Statute, § 36–498(a)(2) (Count Five); common law fraud (Count Six); violation of Connecticut General Statutes § 42–110b (Count Seven); violations of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 *et seq.* (Count Eight); and conspiracy to violate the same (Count Nine). Plaintiff also alleges common law fraud with respect to the Note Modification Plan (Count Ten).

## DISCUSSION

### Statute of Limitations

■ Defendant argues that plaintiff's federal security law claims are time-barred because the 1991 amendment to the Securities Exchange Act of 1934 is unconstitutional. In 1991, the United States Supreme Court adopted a uniform limitations period for actions brought pursuant to section 10(b) of the Securities Exchange Act of 1934. It held that such actions must be commenced within one year of the facts constituting the violation and no later than three years from the transaction. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The limitations period applied retroactively. *Welch v. Cadre Capital,* 946 F.2d 185 (2d Cir.1991).

In response, Congress amended the 1934 Act to preserve certain private section 10(b) claims that would be dismissed as untimely

pursuant to the Supreme Court's ruling. Pub.L. No. 102–242, 105 Stat. 2387. Section 27A(a) provides that the pre-*Lampf* rules of the various circuits apply to cases pending on or before June 19, 1991, the date of the Supreme Court's ruling. 15 U.S.C. § 78aa–1(a). Section 27A(b) provides that claims that were dismissed pursuant to the Supreme Court's ruling could be revived. 15 U.S.C. § 78aa–1(b).

Defendant argues that section 27A is unconstitutional because it violates the separation of powers doctrine. At the time the argument was made in 1992, neither the Second Circuit nor the Supreme Court had addressed the issue. However, in 1993, the Second Circuit ruled that section 27A(a) is constitutional. *Axel Johnson Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 81 (2d Cir.1993).

In April 1995, the Supreme Court ruled that section 27A(b) contravenes the Constitution's separation of powers because it requires federal courts to reopen final judgments that were entered after its enactment. *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). However, as section 27A(a) does not require the reopening of "final judgments" but only applies to pending cases, the opinion does not address that subsection. Accordingly, cases that were pending on June 19, 1991 that have not been dismissed are governed by the rules of the respective circuits.

■ In 1990, the Second Circuit ruled that the appropriate limitations period for section 10(b) claims was a one-year/three-year scheme. *Ceres Partners v. GEL Assoc.,* 918 F.2d 349, 364 (2d Cir.1990). However, this limitations period was later held to not apply retroactively to cases filed before November 8, 1990, the date *Ceres* was decided. Actions filed before that date are governed by the state statute of limitations which is most analogous to the federal claim. *Welch v. Cadre Capital,* 923 F.2d 989, 992–95 (2d Cir.) ("Welch I"), *vacated sub nom. Northwest Sav. Bank v. Welch,* 501 U.S. 1247, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991).

As this case was filed on October 17, 1988, the most analogous Connecticut limitations period applies. As noted in this Court's rul-

ing on defendant's motion to dismiss, the most analogous statute of limitations is the two-year period for fraud actions under the Connecticut Uniform Securities Act. Conn. Gen.Stat. § 36–498(f) (1995); *Clute v. Davenport,* 584 F.Supp. 1562, 1577 (D.Conn.1984). In that ruling, this Court found that, as the issue of whether plaintiff used reasonable due care is one of fact, the action could not be deemed time-barred on a motion to dismiss. In light of the fact that defendant has not argued in this motion that plaintiff failed to use reasonable due care, the Court's ruling stands.

### Summary Judgment

■ A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party carries the burden to demonstrate the absence of any material factual issue genuinely in dispute. *American Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981). However, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). If the issue is one where the moving party would not bear the burden of proof at trial, that party may discharge its burden on summary judgment by showing that there is a lack of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2553–54. In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

■ Defendant has met its initial burden of establishing its right to recover on the promissory notes. The notes provide that they shall be governed by and construed according to the laws of Connecticut. In an action to enforce a promissory note, the authenticity of, and authority to make each signature on the instrument is admitted un-

less specifically denied in the pleadings. Conn.Gen.Stat. § 42a–3–308 (1995) [formerly § 42a–3–307(1) ]. It is undisputed that plaintiff signed the promissory notes, that they are due and payable, and that plaintiff has failed to make payments consistent with the notes' terms beginning with the September 1987 interest payments.

As defendant has met its burden to show entitlement to payment, plaintiff must come forward with admissible evidence showing that a genuine issue of material fact exists as to any defense on any of the promissory notes. Conn.Gen.Stat. § 42a–3–308 (1995) [formerly § 42a–3–307(2) ]; *Conn. v. Dadi,* 182 Conn. 530, 531, 438 A.2d 733 (1980). Plaintiff argues that all six of the notes are unenforceable because they were each part of a single transaction into which he was fraudulently induced into investing. He argues that the second two notes are also unenforceable because they were part of a single transaction in which defendant aided and abetted the violation of the federal securities laws. Defendant does not dispute plaintiff's contention that the notes were part of the entire limited partnership investment and not separate agreements. Its reply memorandum concedes that the notes were executed "in connection" with the limited partnerships.

Plaintiff's defense based upon aiding and abetting a violation of the federal securities laws is no longer cognizable in light of the United States Supreme Court's recent ruling in which it held that a private plaintiff may not maintain an aiding and abetting suit under section 10(b). *Central Bank of Denver v. First Interstate Bank,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Court will *sua sponte* dismiss Count Two of the Second Amended Complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Accordingly, plaintiff's only defense on the notes rests in common law fraud.

### Fraudulent Inducement

■ Fraud in the inducement to enter a contract is a well-established equitable defense under Connecticut law. *Conn. National Bank v. Voog,* 233 Conn. 352, 367, 659 A.2d

172 (1995) *citing Texaco, Inc. v. Golart*, 206 Conn. 454, 459, 538 A.2d 1017 (1988). The essential elements of fraud are (1) that a false representation was made as a statement of fact; (2) that it was known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. *Maturo v. Gerard*, 196 Conn. 584, 587, 494 A.2d 1199 (1985) (citations omitted). Any misrepresentation must relate to an existing or past fact. It may relate to a future promise only where there exists a present intent not to fulfill the promise. *Paiva v. Vanech*, 159 Conn. 512, 515, 271 A.2d 69 (1970). The elements are issues of fact and as such are generally left to the trier of fact who can properly judge the credibility of testimony and weigh the evidence. *Maturo v. Gerard*, 196 Conn. at 587–88, 494 A.2d 1199.

■ When determining a summary judgment motion, the court must consider the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254, 106 S.Ct. at 2513. The standard for the first three elements of fraud is proof by "clear and satisfactory" or "clear, precise and unequivocal" evidence. *Barbara Weisman, Trustee v. Kaspar*, 233 Conn. 531, 540, 661 A.2d 530 (1995) (citations omitted).

■ Plaintiff submitted several affidavits in support of his defense. Defendant argues that they should not be considered because they do not comport with the requirements of Fed.R.Civ.P. 56(e). Affidavits submitted in opposition to a summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). They should not contain argument or conclusions of law. However, an entire affidavit need not be stricken if it includes some inadmissible material. The court may simply disregard the inadmissible material. *U.S. v. Alessi*, 599 F.2d 513, 514–15 (2d Cir.1979). Accordingly, the portions of the affidavits that are not made on personal knowledge, or consist of legal argument or conclusions will not be considered.

## A. The First Promissory Note—Telentry Research

■ The complaint does not allege that plaintiff was fraudulently induced into executing the first promissory note as part of Telentry Research. Furthermore, plaintiff has not pointed to any facts or made any arguments concerning fraud in relation to Telentry Research. Accordingly, plaintiff's defense must fail and defendant's motion for summary judgment on the first promissory note will be granted.

## B. The Second Promissory Note—Telentry Development

### 1. False or Misleading Statements

■ Plaintiff alleges that false or misleading statements were made regarding the extent of defendant's direct lending relationship with Telentry and the intended uses of the offering proceeds. He contends that defendant failed to disclose the fact that at least some of the proceeds of the offering were to be used to repay existing loans.

The record indicates that defendant made several loans to Telentry that were repaid out of the last closing of Telentry Development on September 19, 1984. They included a March 30, 1984 unsecured demand loan of $50,000 that was issued to act as "window dressing" for Telentry's fiscal year that ended on March 31, 1984; a April 30, 1984 secured loan of $50,000 for working capital; a June 8, 1984 unsecured loan of $25,000; and a August 3, 1984 unsecured loan of $100,000.

Plaintiff has presented sufficient evidence to create genuine issues of material fact as to whether it was intended, during the time Telentry Development was being marketed, that the first two loans would be repaid from the proceeds and whether prospective investors were informed of this intention. The Loan Presentations for the loans state that they were for working capital and that they were to be repaid out of Telentry's corporate income. The partial copy of the Telentry Development offering memorandum in the record does not indicate that any of the proceeds would be used to repay loans or that any part would go towards the operating

expenses of Telentry. It provides that $2,000,000 of the proceeds would go towards research and development, that $2,100,000 would be pooled in a nondiscretionary grantor trust for investors and that the rest, approximately $890,500, would be used for other expenses of the partnership. However, a July 31, 1984 Loan Presentation states that "all debt" would be paid out of the proceeds from the first Telentry Development closing scheduled for August 15, 1984.

Plaintiff has also presented sufficient evidence to create a genuine issue of material fact as to whether prospective investors were told that the second two loans would be repaid from the proceeds. Both loans were executed while Telentry Development was being marketed. The Loan Presentations for both state that they were to be repaid out of the forthcoming closing of Telentry Development. However, by affidavit two investors state that this was never reported at sales meetings. Jon Gould and Jeffrey A. Goldfarb, investors in the second, third and fourth limited partnerships, state that they attended several sales meetings for the partnerships at which Stark was present. Gould specifically states that defendant's representatives participated at several meetings prior to the closing on Telentry Development at which "status reports" were given and sales efforts were made. Both investors state that Stark never told them that "monies being raised by partnership investments were being used to satisfy prior indebtedness of Telentry. . . ."

Defendant argues that it did not have a duty to disclose the existence of any of Telentry's liabilities. Plaintiff contends that such a duty stemmed from the facts that defendant participated in the Telentry transactions and that it had voluntarily made statements regarding the transactions.

 Under Connecticut law, a misrepresentation in the form of nondisclosure is cognizable where equitable rescission of a promissory note is sought. *Pacelli Bros. Transportation, Inc. v. Pacelli,* 189 Conn. 401, 410, 456 A.2d 325 (1983) (citations omitted). Fraud by nondisclosure involves the failure to make a full and fair disclosure of known facts regarding a matter about which a party "assumes to speak." *Duksa v. Mid-*

*dletown,* 173 Conn. 124, 127, 376 A.2d 1099 (1977).

Whether defendant assumed to speak about Telentry's liabilities thereby creating a duty to disclose additional liabilities is a genuine issue of material fact that encompasses the first three prongs of fraud. To sustain such a duty, it must be found that defendant knew the contents of the offering memorandum and that it at least participated in the effort to sell the limited partnership. As these matters will be found to be genuine issues of material fact best left to the trier of fact, so must the issue of defendant's duty of disclosure.

### 2. *Defendant's Knowledge*

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to defendant's knowledge that prospective investors were misled as to the intended use of the proceeds. First, there is evidence that defendant knew the contents of all the offering memoranda. At deposition, Stark testified that in order to prepare the Loan Presentation for the first offering, he was given a draft of the offering memorandum. He testified that before and after the Loan Presentation for the second offering was approved, counsel was consulted because the structure was unique. Gershman, at deposition, agreed that Stark and other bank employees were familiar with the offering material from the first partnership because it was a new type of financing vehicle. He further testified that he and Stark discussed the potential liability of the offering memorandum in relation to the second partnership, and that Stark told him that in 1984 and 1985, he had read the various offering materials. Gershman also testified that at sales meetings for the partnerships, Stark answered specific questions by potential investors that assumed familiarity with the offering memoranda.

Second, there is evidence that defendant participated at sales meetings at which prospective investors were allegedly not given updated information regarding Telentry's liabilities. Gershman testified that a representative of defendant, usually Stark, participat-

ed in almost all of the approximately 50 sales meetings or receptions for the limited partnerships. Gould and Goldfarb also state that Stark participated in sales meetings prior to the closing of Telentry Development.

### 3. *Inducement*

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether the alleged misrepresentations were made to induce plaintiff into investing and endorsing the promissory note. Gershman testified that Stark attended the sales meetings out of "the desire by [defendant] to assist [Telentry] in securing additional partnerships." Gould and Goldfarb state that Stark was not a "passive observer" but rather "an active participant in the effort to solicit sales of partnership units." They state that Stark commented favorably about the financial condition of Telentry. They also state that he stressed that Gershman was a "substantial, financially responsible individual" which indicated that an investment in Telentry would be worthwhile, and that he stressed the close relationship between Telentry and defendant.

### 4. *Reliance*

 Under Connecticut law, a person claiming relief must have justifiably or reasonably relied on the alleged misrepresentation. *Maturo v. Gerard*, 196 Conn. 584, 589, 494 A.2d 1199 (1985). The question of reasonableness is one of fact to be determined based on all the circumstances. *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 580, 657 A.2d 212 (1995) (citations omitted).

Defendant argues that plaintiff is unable to show that he justifiably relied on any misrepresentations because he allegedly knew of the actual financial condition of Telentry and its lending relationship with defendant. At deposition, Gershman testified that he believed all of the investors knew of the direct lending relationship. When asked specifically whether it was his understanding that plaintiff knew before November 1985, Gershman answered "yes" because plaintiff did work as an accountant for Telentry and brought in a "number of his clients."

However, by affidavit, plaintiff states that he was not fully aware of the true financial condition of Telentry or that it was something other than that presented in the offering memoranda. In light of plaintiff's statement, defendant has not shown that there is no evidence supporting plaintiff's contention that he justifiably relied on any misrepresentations. Whether plaintiff actually knew the true facts regarding Telentry's financial status and the entire lending relationship remains a genuine issue of material fact that is best left to the trier of fact. Summary judgment as to the second promissory note will be denied.

### C. *The Third and Fourth Promissory Notes—Telentry XL*

 Plaintiff alleges that, at sales meetings and in the Telentry XL offering memorandum, defendant made false representations as to its direct lending relationship with and commitment to Telentry, the financial condition of Telentry, and the intended use of the proceeds of the offering. However, he fails to point to any specific misrepresentations or omissions.

As previously discussed, Gould and Goldfarb state that Stark commented favorably about the financial condition of Telentry at sales meetings. Neither investor ever heard Stark advise anyone that the proceeds of any offering were being used to satisfy prior indebtedness of Telentry or that the company could not survive without infusions of cash. In addition, Anthony Scalzi, an investor in Telentry XL, states by affidavit that at a sales meeting in mid-December 1984, Stark assured him that the future for Telentry looked excellent. He states that during a conversation of about 15 to 20 minutes, Stark never mentioned anything indicating that the company was in a "precarious financial condition."

Although all three investors agree that Stark never conveyed anything negative about Telentry's financial condition, they never indicate why Stark's statements were false or misleading. They fail to point to specific facts indicating that, at the time Telentry XL was being marketed in late 1984,

Telentry was financially weak or that the proceeds of the offering were going to be used to satisfy prior debts.

Similarly, plaintiff has not pointed to any evidence in support of his allegations that the Telentry XL memorandum contained material omissions. Scalzi states that the Telentry XL offering memorandum did not disclose $600,000 of Ralion leases or the extension of the $600,000 letter-of-credit. However, the only evidence in the record indicates that both transactions were completed after the memorandum was prepared and distributed.

Although the contents of the Telentry XL offering memorandum are crucial to support plaintiff's allegations, a copy has not been submitted nor has an explanation for its absence been provided. Neither plaintiff nor defendant have alleged when it was prepared or distributed to prospective investors. However, evidence indicates that it was prepared and initially distributed sometime in late October or in November 1984. Defendant's Executive Committee approved the Telentry XL transaction on October 25, 1984, plaintiff signed the first promissory note on November 27, 1984 and it was delivered to defendant at the first closing on December 4, 1984.

Evidence in the record also indicates that the $600,000 letter-of-credit was extended after the offering memorandum was distributed to prospective investors. It was extended on November 30, 1984, after plaintiff signed the first promissory note and was cancelled out of the proceeds from the following partnership offering, Telentry Research II.

Furthermore, plaintiff has failed to offer any evidence showing that the Ralion leases were financed before the offering memorandum was prepared and distributed. Plaintiff and defendant agree that $599,310.02 of Ralion leases were executed in November 1984. However, defendant has not stated or offered evidence indicating the exact date of the financing. Given the close proximity of the lease financing to the distribution of the offering memorandum, Scalzi's mere allegation that the leases should have been included in the Telentry XL offering memorandum is not sufficient.

Plaintiff has also failed to offer any evidence showing that the intended uses of the proceeds of the Telentry XL offering were other than those given in the memorandum or even that the proceeds were actually put to different uses. There is no evidence that Telentry's financial condition at the time made the projected uses impossible. While plaintiff has alleged, through Scalzi's affidavit, that the proceeds were intended to be used to pay pre-existing debt, he has not pointed to the specific debt to which he refers. There is no evidence in the record of outstanding loans during the time Telentry XL was being marketed or closed. The letter-of-credit was cancelled out of the proceeds of the following partnership offering.

Lastly, plaintiff makes somewhat vague allegations that while defendant was stressing its commitment to Telentry, it was in fact attempting to withdraw its backing of the company. In support of this contention, plaintiff points to notes by Robert B. Woerheide, an officer of defendant. The notes indicate that, at the time they were written, defendant sought to "shut off funds" to Telentry. However, they were written in late 1985, a year after the closing of Telentry XL. In fact, contrary to plaintiff's assertions, the evidence indicates that in late 1984, defendant was committed to Telentry. It had financed the Ralion leases, extended the letter-of-credit and made loans for operational purposes.

As plaintiff has failed to come forward with any admissible evidence indicating a genuine issue as to whether false or misleading statements were made with regard to Telentry XL, it need not be determined whether there is any genuine issue of material fact for trial regarding the other three elements of fraud. Defendant's motion for summary judgment on the third and fourth notes will be granted.

D. *The Fifth and Sixth Promissory Notes—Telentry Research II and Telentry Development II*

██ Plaintiff's defense on the fifth and sixth notes rests on the allegation that defendant failed to correct the false statements it made in connection with Telentry Research II. By affidavit, Robert L. Renck, Jr., the

CEO of Renck, Levy & Co., Inc., states that his company was the placement agent for Telentry Research II and that he reviewed the private placement memorandum in connection with the placement. He states that the Telentry financial statements that were included were dated September 30, 1984. As the statements were several months old, he asked Stark whether the listed liabilities were the only liabilities of Telentry that existed. Renck states that he questioned Stark in mid-February, on February 28, on March 7 or 8 and in early April 1985, and that on each occasion, Stark "expressly stated" that the liabilities listed on the September 30, 1984 financial statements were the only liabilities of Telentry that existed at that time. Renck states that had he known that additional debt existed, he would have terminated the transaction. Scalzi states that the same September 30, 1984 financial statement was included in the placement memorandum for Telentry Development II dated May 10, 1985 without an update.

In response, defendant argues that competent testimony by a qualified accountant is required to show that the financial statements were in fact false and misleading. However, even without the testimony of a qualified accountant, this Court finds that plaintiff has presented sufficient evidence showing that a genuine issue of material fact exists as to whether the financial statements accompanying the offering memoranda for both Telentry Research II and Telentry Development II were false or misleading.

The balance sheet for Telentry dated September 30, 1984 that plaintiff alleges accompanied the Telentry Research II offering memorandum lists assets of $1,791,792, "Current liabilities" of $296,836 and "Other liabilities" of $841,758. However, the record indicates that Telentry acquired substantial liabilities subsequent to September 30, 1984 and prior to the final closing of Telentry Research II, scheduled for March 31, 1985. Defendant made an unsecured demand loan of $250,000 to Telentry on February 13, 1985, and a secured demand loan of $500,000 on March 12, 1985. The Loan Presentations for both loans state that each would be repaid out of the proceeds of the last closing of Telentry Research II. Both Loan Presentations also indicate that there were $1,000,000 worth of outstanding Ralion leases. At least $599,310.02 worth of those leases were financed in November 1984. The Loan Presentation for the February 1985 loan states that the $600,000 letter-of-credit that had been issued on November 30, 1984, would be cancelled by payment from the first Telentry Research II closing or other Telentry funds.

In addition, defendant made at least two loans to Gershman before the final closing of Telentry Development II. It made an unsecured demand loan of $100,000 on May 16, 1985, and another unsecured demand loan of $250,000 on May 24, 1985.

For the reasons outlined in the section of this ruling regarding the second note, plaintiff has also presented sufficient evidence to create a genuine issue of material fact as to (1) defendant's knowledge of the contents of the offering memoranda; (2) whether any misrepresentations were made to induce plaintiff into investing and endorsing the promissory note; and (3) whether plaintiff justifiably relied on any misrepresentations in the offering memoranda. In addition, there is evidence indicating that defendant had an interest in seeing that the Telentry Development II units were sold. A October 25, 1985 Loan Presentation acknowledges that when Telentry Development II had been under consideration by defendant, it was determined that "not to fund was the greater danger." Defendant believed that if it did not fund the partnership, it risked leaving its unsecured Ralion leases exposed and being sued by limited partners. Defendant's motion for summary judgment as to the fifth and sixth notes will be denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [63] on Count Seven of its counterclaim is GRANTED, on Count Nine is DENIED, on Count Eleven is GRANTED, on Count Thirteen is GRANTED, on Count Fifteen is DENIED, and on Count Seventeen is DENIED. Count Two

of the Second Amended Complaint is dismissed *sua sponte.*