**Michel DELACROIX, Plaintiff,**

**v.**

**LUBLIN GRAPHICS, INC., Defendant.**

**No. 3:94CV01037 (WWE).**

United States District Court,
D. Connecticut.

Aug. 12, 1997.

Walter Sidor, Hartford, CT, Jay B. Hashmall, White Plains, NY, for Plaintiff.

William A. Phillips, More, Phillips & Duncan, P.C., Greenwich, CT, for Defendant.

### *Ruling on Cross–Motions for Summary Judgment*

EGINTON, Senior District Judge.

This lawsuit involves a dispute between plaintiff, Michel Delacroix, a renowned French artist, and defendant Lublin Graphics, Inc., his former publisher, as to the parties' rights to 10,831 reproduction pieces of artwork. The parties have filed cross-motions for summary judgment. Plaintiff's motion asks the court to direct defendant to deliver to him the 10,831 prints in defendant's possession upon payment by plaintiff of the sum of $6,000 and to direct defendant to register assignments of all Delacroix copyrights with the United States Copyright Office. Defendant's motion asks the court to grant summary judgment in its favor on the ground that plaintiff lacks standing to bring this lawsuit. For the reasons set forth below, both motions for summary judgment will be denied.

### *Background*

Plaintiff, Michel Delacroix, is a French painter known worldwide for his renditions of Paris scenes, monuments, and cathedrals. Defendant, Lublin Graphics, Inc., was the publisher of his artwork from approximately November 1, 1972, through October 31, 1988. Pursuant to annual renewable contracts, plaintiff painted numerous oil paintings and water colors from which defendant produced limited edition graphics. These were manually signed and numbered by plaintiff. Defendant also published non-manually signed archive prints and posters, which were known as "Touchstone" [1] materials. Defendant then marketed, distributed, and sold these reproductions to the art-buying public. The relationship between plaintiff and defendant was an exclusive one, such that defendant was the only publisher of plaintiff's artwork during this period.

In 1988, the relationship between plaintiff and defendant came to an end, and plaintiff entered into a new five-year relationship with a different publisher, Chalk & Vermilion Fine Arts of Greenwich, Connecticut. This change in publishers was precipitated by plaintiff's concern over the amount of compensation he was receiving and his refusal to sign a series of lithographs of five French cathedrals (the "Cathedral Series") without additional compensation. The details of what

---

**1.** These were sold through a subsidiary corporation Touchstone Publishers of Delaware, Inc., which was merged into Lublin as a division in 1985. *See* Exhibit A to Plaintiff's Complaint,

Agreement dated October 8, 1991, between Lublin Graphics, Inc., and Chalk & Vermilion Fine Arts.

transpired between the parties are not important to the instant lawsuit. However, several lawsuits ensued, one in this court and another in France, involving plaintiff, plaintiff's manager, Richard Nadeau, and defendant. The federal lawsuit was dismissed based upon a forum selection clause in the agreement between the parties which selected Paris, France, as the forum for the resolution of disputes arising out of the agreement. *Lublin Graphics, Inc. v. Richard Nadeau and Michel Delacroix,* No. B–88–588 (EBB).

Eventually the remaining disputes between the parties were resolved in a somewhat circuitous manner through an agreement between defendant Lublin and Chalk & Vermilion, which had not been a party to the litigation, and a second agreement between Chalk & Vermilion and plaintiff. It is the first agreement, to which plaintiff was *not* a party, that is the subject of plaintiff's breach of contract claims.

Chalk & Vermilion's involvement in the settlement of these prior cases came about by virtue of its desire to obtain the exclusive rights to market plaintiff's artwork, as well as an immediate inventory of Delacroix artwork to sell. As plaintiff's new publisher, it was also in a better position to secure plaintiff's cooperation in signing the Cathedral Series lithographs. Defendant, on the other hand, was interested in recouping some of its losses in connection with the Cathedral Series.[2] To accomplish these ends, Chalk & Vermilion paid in excess of $660,000 to purchase from defendant all of plaintiff's artwork in defendant's possession,[3] together with the copyrights thereto. Defendant was also entitled to receive a ten percent (10%) commission on Chalk & Vermilion's sale of the Touchstone prints and books for a twenty-seven-month period. Defendant further agreed to provide consulting services to Chalk & Vermilion and not to compete with respect to the sale of Delacroix artwork that might come into its possession from the time of execution of the agreement until July 1, 1994, a period of twenty-seven months. Specific consideration was paid for the consulting agreement as well as the non-compete clause.

The agreement further gave Chalk & Vermilion a right of first refusal to any after-acquired Delacroix artwork, such as that which might be returned to defendant from galleries ("after-acquired artwork"). The agreement also contemplated that adjustments to the purchase price might be necessary if Lublin discovered additional pieces of Delacroix artwork over and above the quantities listed on the schedules to the agreement ("newly-discovered artwork"). An adjustment schedule set forth shortfall and overage prices. If any of the items listed on schedule A were not delivered in good and marketable condition, a deduction from the purchase price would be made; and if Chalk & Vermilion received any pieces in excess of the number listed, an overage would be charged in the following amounts:

1. Touchstone prints—86 cents each for large sheets;

2. Touchstone prints—36 cents each for small sheets;

---

2. Defendant claims to have lost in excess of $1,185,750.

3. The agreement provided in relevant part:

Seller hereby sells, transfers and assigns to Purchaser *any and all artwork of Michel Delacroix in the possession of Seller (all as listed on Schedule A hereof)* together with any and all rights Seller has to deal with or dispose of said artwork ... and *together with any and all copyrights thereto* which Seller may have .... Agreement at ¶ 1 A (emphasis added). Schedule A consisted of several documents that listed various works of art of plaintiff and the quantities that defendant had on hand. The parties to this lawsuit do not agree on which documents comprised Schedule A. Because the court finds that the plain language of the contract contemplated that defendant was selling to Chalk & Vermilion all of the Delacroix artwork in its possession, the precise contents of Schedule A are not important. The court makes this finding based upon the following contract provisions. Not only does the first paragraph quoted above include "any and all artwork," but the remainder of the contract contemplates a transfer of everything: defendant agreed not to compete and agreed to provide customer lists; defendant was required to give Chalk & Vermilion a right of first refusal on "after-acquired" artwork and to transfer newly discovered artwork for a slight overage; defendant agreed to transfer all copyrights and all materials necessary for the reproduction of the prints. Moreover, there is nothing in the contract that indicates that any Delacroix artwork was not transferred or was reserved for sale by defendant at the end of the non-compete period.

3. Archive prints—$3.00 each;

"*provided* that such obligation to pay for additional items shall not exceed two thousand (2,000) of such items, of categories 1–3 together."

4. Signed lithographs—$175.00 each (up to 50 additional pieces).

These prices applied to both "after-acquired artwork," [4] and to "newly-discovered artwork."

The agreement further provided that Chalk & Vermilion would have plaintiff sign the unsigned Cathedral Series lithographs, which were being delivered by Lublin, and if plaintiff refused to do so, Chalk & Vermilion had the right to void the entire agreement. Additionally, Chalk & Vermilion agreed that it would provide defendant with unconditional releases executed by plaintiff and his agent, Richard Nadeau, and defendant would provide Chalk & Vermilion with unconditional releases executed by its principals, Michelle and Vincent Cassanetti. All obligations under the agreement were conditioned upon the execution and delivery of the releases with respect to the pending litigation. The writing embodying this agreement was signed and dated October 8, 1991.

As noted, plaintiff Michel Delacroix was not a party to this agreement. It is unclear why he was not made a party to the agreement, since he had an obvious interest in the subject matter, and the agreement was conditioned upon his executing a release, as well as his signing the Cathedral Series lithographs. Instead, to ensure plaintiff's cooperation and compliance, Chalk & Vermilion entered into a letter agreement with him dated the same day, in which he agreed to sign the Cathedral Series lithographs. The letter agreement also states that Chalk & Vermilion agreed to "terminate Touchstone" and to deliver to plaintiff any and all copyrights and material used for production. Plaintiff, on

the other hand, agreed not to license, produce, or revive a Touchstone-type program, including but not limited to archive posters and prints. The termination of the Touchstone program is somewhat puzzling in light of Chalk & Vermilion's agreement with defendant to pay a commission of $140,000, which was payable even if Chalk & Vermilion did not pursue marketing the Touchstone materials. Apparently, the $140,000 was considered by Chalk & Vermilion to be part of the purchase price for the other Delacroix artwork and copyrights.

This letter agreement between plaintiff and Chalk & Vermilion did not specifically reference the agreement between defendant and Chalk & Vermilion, but it did state that the purpose of the letter was to confirm Chalk & Vermilion's agreement with respect to the purchase of all Delacroix artwork in the possession of defendant. It further provided that nothing contained in the letter was "intended to change or modify the general releases or any other matters that have been negotiated" by plaintiff's attorney.

As required by the letter agreement, plaintiff signed the Cathedral Series lithographs and the release, thus ending the then-pending litigation. Defendant likewise signed a release and transferred all of the copyrights to plaintiff or a corporation owned by plaintiff. Both releases preserved defendant's right to dispose of or distribute plaintiff's artwork, "previously, now or hereafter in the possession of" defendant. Plaintiff claims that, although the copyrights were transferred, the assignments of the copyrights were never registered by defendant with the Patent and Trademark Office.

In June, 1994, plaintiff became aware that defendant was going to offer for sale certain Touchstone artwork through an offering circular,[5] which gave a release date of July 1,

---

4. Paragraph 4 of the agreement provided, in relevant part, that:

Seller and its principals ... covenant and agree that they will not sell any Delacroix artwork ... which may come into their possession after the execution of this Agreement unless such artwork has first been offered to Purchaser for purchase *at the adjustment price set forth in this Agreement* ....

5. The Touchstone artwork being offered for sale by defendant includes the following: 4,000 prints of *Grand Bal,* 4,000 prints of *Le Menage,* 592 prints of *Parfumerie Guerlain,* 152 pieces of *Bord De La Seine Sous La Neige,* 711 pieces of *Kiosque,* 263 pieces of *Nuit De Decembre,* 371 pieces of *Azay–le–Rideau,* 231 pieces of *Moulin De La Galette,* 257 pieces of *Parade,* and 254 pieces of

1994. This lawsuit ensued.[6] Plaintiff sued defendant for breach of the 1991 agreement between defendant and Chalk & Vermilion and for copyright infringement. This latter claim, however, has not been pursued, according to plaintiff because of defendant's failure to register the copyrights in plaintiff's name. Defendant counterclaimed for plaintiff's breach of contract due to plaintiff's refusal to sign the Cathedral Series lithographs.[7]

Plaintiff's difficulties with his publishers were not limited to those with defendant Lublin. When Chalk & Vermilion's publishing contract with plaintiff ended, a dispute arose concerning the Touchstone prints, as well as the copyrights. Ultimately, on May 30, 1996, this dispute was resolved through a "Consent and Waiver" from Chalk & Vermilion to plaintiff. In this agreement Chalk & Vermilion consented and agreed to

(1) the transfer from Lublin Graphics, Inc. to Michel Delacroix or his designee, of all Touchstone Posters (as defined in the Settlement Agreement [8]) or other non-manually signed Delacroix material, in Lublin's possession, to which both Michel Delacroix and Chalk & Vermilion have previously claimed a right arising out of agreements dated October 8, 1991, such transfer to be upon such terms and conditions as may mutually be agreed to between Michel Delacroix and Lublin Graphics, Inc., provided such transfer is obtained and made at no

cost or expense to Chalk & Vermilion or any related or affiliated person or entity; and (2) the direct assignment by Lublin Graphics, Inc. or any related or affiliated company to Michel Delacroix, or his designee, of any and all copyrights of images created by Michel Delacroix, which copyrights were previously registered by Lublin Graphics, Inc., Touchstone Publishers of Delaware, Inc., or any related or affiliated company, and were acquired by Chalk & Vermilion in the agreement dated October 8, 1991 ("Delacroix copyrights" hereafter).

David Rogath and Chalk & Vermilion Fine Arts represent and warrant that they have transferred to Michel Delacroix all of their rights, title and interest to these Touchstone non-manually signed materials and all Delacroix copyrights, and do hereby waive any and all claims, rights, title and interest thereto.

In part, based upon this "Consent and Waiver," which plaintiff characterizes as an "assignment," plaintiff asserts the right to step into the shoes of Chalk & Vermilion to assert their alleged right to purchase the 10,831 pieces of Touchstone artwork for a maximum price of $6,000 [9] and to require defendant to register the assignments of the copyrights. Plaintiff speculates that these archive prints were discovered by defendant in its inventory, having been mislabeled as

*Moulin Rouge la Nuit*, for a total of 10,831 pieces.

**6.** In the complaint, plaintiff seeks both monetary damages and a preliminary injunction to prevent defendant from selling the Touchstone artwork. The need for the preliminary injunction became moot when the defendant voluntarily agreed not to sell these items pending the resolution of this lawsuit.

**7.** Defendant counterclaimed for costs and attorney's fees under the Federal Copyright Act, 17 U.S.C. § 505, and breach of contract due to plaintiff's earlier refusal to sign the Cathedral Series lithographs. Although defendant's breach of contract counterclaim is not addressed by the pending motions for summary judgment, the court notes that this same claim was the subject of the prior litigation between plaintiff and defendant, *Lublin Graphics, Inc, v. Richard Nadeau and Michel Delacroix*, No. B 88–588(EBB) (D.Conn.), that was dismissed on improper venue grounds, and was included in the general release

given by Michelle and Vincent Cassanetti and Lublin Graphics, Inc., to Michel Delacroix. This release would bar this claim.

**8.** Presumably, this refers to a settlement agreement between plaintiff and Chalk & Vermilion, rather than the 1991 agreement between defendant Lublin and Chalk & Vermilion. The "Settlement Agreement," however, is not attached to the Consent and Waiver that has been provided to the court.

**9.** Plaintiff arrives at this figure by multiplying the 2,000 pieces, which was the maximum number of pieces for which Chalk & Vermilion was obligated to pay an overage fee, by the maximum price of $3.00 per piece. It is not clear from the language of the contract whether this 2,000 piece maximum also applied to "after-acquired artwork" which was subject to the same overage prices.

the work of another artist. Plaintiff contends that they would be considered "newly-discovered artwork," to which the overage price would apply and as to which Chalk & Vermilion's right of first refusal would not apply. Defendant claims that these pieces are either "after-acquired artwork" or artwork that was never "for sale" under the 1991 agreement, including 4,000 pieces each of *Grand Bal* and *Le Menage*. Defendant states that in April, 1994, it wrote to Chalk & Vermilion offering it a right of first refusal to purchase all of these pieces, including the 4,000 *Le Grand Bal* prints and the 4,000 *Le Menage* prints. Chalk & Vermilion did not respond and therefore Lublin claims that it had the right to sell these to any interested purchaser.

## Discussion

### I. Rule 56(e) Requirements for Affidavits

Before addressing the merits of the cross-motions for summary judgment, the court addresses the egregious violations of Rule 56(e), Fed.R.Civ.P., by both parties' affidavits. The requirements of Rule 56(e) for the "form of affidavits" are straight-forward. Under Rule 56(e), affidavits must "be made on personal knowledge," must "set forth such facts as would be admissible in evidence," and must "affirmatively state that the affiant is competent to testify to the matters stated therein." They should not contain arguments or conclusions of law. *Amatulli v. People's Bank*, 917 F.Supp. 895, 904 (D.Conn.1996); *Windover v. Sprague Technologies*, 834 F.Supp. 560 (D.Conn.1993). When an affidavit does not comply with these basic requirements, the offending portions should be stricken or disregarded by the court. *Amatulli*, 917 F.Supp. at 904.

Even the most lenient reading of the affidavits submitted by both sides requires the court to disregard a substantial portion of the affidavits. The affidavits are fraught with conclusory statements, legal arguments, speculation, and the affiant's self-serving interpretation of the agreements. The affidavits contain some of the most flagrant violations of the Federal Rules of Civil Procedure that the court has encountered in nearly twenty years on the federal bench. In one

affidavit, for example, the affiant argues that defendant should be precluded from producing certain evidence because it is not contained in the pretrial order; that a review of defendant's answer fails to indicate certain things; that he has certain "understandings" as to where the 10,831 Touchstone prints were found and that certain legal conclusions must be drawn based upon those understandings. The affiant then argues in opposition to the affidavit submitted by defendant. This is but one example. The other affidavits are replete with similar "statements." None of these matters are appropriate for an affidavit, which is to contain recitations of fact of which the affiant has personal knowledge and which would be admissible in evidence. Accordingly, the court will not consider these designated portions of the following affidavits:

Bertrand Delacroix's Affidavit in Support of Plaintiff's Motion for Summary Judgment: paragraphs 4, 5, 6, 7, 8, 11, 13, 15, 16, 17, 18, and 19;

Michelle Cassanetti's Affidavit in Support of Defendant's Cross–Motion for Summary Judgment: all of paragraph 9 except the first sentence, paragraph 10, the fourth and fifth sentences in paragraph 13, paragraphs 14 and 15;

Bertrand Delacroix's Affidavit in Opposition to Defendant's Cross–Motion for Summary Judgment: paragraphs 2, 5, 7–16; and

Michel Delacroix's Affidavit in Opposition to Defendant's Cross–Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment: paragraphs 2, 3, 6, 7, the portion of paragraph 10 as to what other parties knew, paragraph 11 and 12.

The merits of the cross-motions for summary judgment will now be addressed.

### II. Plaintiff's Standing

In this lawsuit, plaintiff attempts to step into the shoes of Chalk & Vermilion to assert its rights under the 1991 agreement to the 10,831 prints for a price of $6,000 and to require defendant to register the assignment of the Touchstone copyrights to plaintiff. Defendant has moved for summary judgment

on the ground that plaintiff lacks standing to bring this lawsuit to enforce Chalk & Vermilion's right under the contract. Because standing is jurisdictional, it is the threshold issue that must be addressed. A plaintiff who lacks standing is not entitled to have his claims litigated in federal court. *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991).

Plaintiff claims that he has standing based upon the 1996 "assignment" from Chalk & Vermilion of the Touchstone Posters and the copyrights. Alternatively, plaintiff argues that the two October 8, 1991 agreements were in reality two halves of a single agreement, which must be read together. Plaintiff also claims to be a third-party beneficiary to the Lublin/Chalk & Vermilion contract.

Defendant counters that the 1991 contract was personal to the parties and, therefore, non-assignable. It further denies plaintiff's claim that his contract with Chalk & Vermilion was part of the same transaction. Indeed, defendant denies having any knowledge of the letter agreement until the commencement of this litigation. Lastly, defendant argues that its 1991 agreement with Chalk & Vermilion was a "buy-sell" agreement between publishers to which plaintiff was not a third-party beneficiary.

As the Supreme Court held in *International Primate Protection League v. Administrators of Tulane Educational Fund,* 500 U.S. 72, 76, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), "[s]tanding does not refer simply to a party's capacity to appear in court. Rather, standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." The court therefore will examine plaintiff's claims in light of his asserted status as a party to the contract, an assignee, and as a third-party beneficiary to determine whether he has standing to bring this action.

### A. Two Agreements as Part of One Transaction

■ In his affidavit, plaintiff admits that he was not aware of the precise terms of the contract between Chalk & Vermilion and Lublin, although he states that he did know that two agreements were executed simultaneously, although not in the same room. Defendant states that it was not even aware of plaintiff's agreement with Chalk & Vermilion. Neither of the 1991 agreements incorporates the other by reference, and, as noted above, there are certain provisions that seem inconsistent, particularly with respect to the "termination" of the Touchstone posters. The court holds that there is insufficient evidence from which it could conclude that these two contracts were part of the same transaction so as to give the plaintiff standing to proceed under the agreement to which he was not a party.

### B. The 1996 "Assignment"

Plaintiff also relies on the 1996 Consent and Waiver signed by Chalk & Vermilion, which he claims operated as an assignment of all rights of Chalk & Vermilion under the 1991 agreement. Defendant counters that the 1991 agreement could not be assigned because it was a "personal" contract and, therefore, non-assignable.

■ As set forth in the Restatement (Second) of Contracts § 317(2)(a), a contract right can be assigned unless the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on the obligor by the contract, or materially impair the chance of obtaining return performance, or materially reduce its value to the obligor. Additionally, a contract right is not assignable if assignment is precluded by the contract. The court finds that none of these reasons apply in the instant case to preclude the assignment of the contract rights that plaintiff seeks to enforce. Plaintiff's assertion of rights originally held by Chalk & Vermilion will in no way increase the obligations of defendant and there is nothing in the contract that would preclude an assignment of these rights.

The court rejects defendant's characterization of the contract as personal and non-assignable. Although the general rule is that a contract for personal services cannot be assigned, it is not the benefits of the contract that are nonassignable, but the duties that are nondelegable. *Rossetti v. City of New*

*Britain*, 163 Conn. 283, 291, 303 A.2d 714, 719 (1972). Although the consultation services to be provided by Michelle and Vincent Cassanetti could be characterized as personal services that could not be assigned, their consultation services were only required for a period of twelve (12) months, which period has long since expired. Moreover, the obligations that plaintiff seeks to enforce, the transfer of prints and the registration of the assignment of copyrights, were not personal service contracts that could not be assigned. There is nothing in the contract or otherwise that would prohibit the assignment of these benefits.

■ A more difficult question, however, is whether there was an assignment of the contract rights. The Consent and Waiver provides in the last paragraph that Chalk & Vermilion has transferred all of its "right, title and interest" to the Touchstone prints and to all Delacroix copyrights. Presumably, the only source of Chalk & Vermilion's "right" to the Touchstone prints was the 1991 agreement with defendant. The Restatement (Second) of Contracts § 328(1) provides: "Unless the language or the circumstances indicate the contrary, ... an assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of the assignor's rights ... under the contract." Although the language of the Consent and Waiver could have been more specific, the court finds that the document manifests an intent by Chalk & Vermilion to assign all of its rights to the Touchstone prints and the Delacroix copyrights to plaintiff and, therefore, operated as a valid assignment of whatever rights Chalk & Vermilion had.

■ But, "there's the rub."[10] Chalk & Vermilion could only assign to plaintiff those contract rights which it still possessed. *In re Trans–United Industries, Inc.*, 351 F.2d 605

(2d Cir.1965). *See Restatement (Second) of Contracts* § 336(1). Defendant asserts that Chalk & Vermilion only had a right of first refusal to these prints, which it characterizes as "after-acquired artwork," which Chalk & Vermilion waived when it did not accept defendant's offer to purchase the artwork for the overage price. Plaintiff does not dispute Chalk & Vermilion's failure to act, but claims that this artwork was "newly-discovered artwork" to which the right of first refusal did not apply. Plaintiff, however, offers no factual support for this supposition.[11] On the other hand, defendant's affidavit is ambiguous as to the source of this artwork. Michelle Cassanetti states only that:

> After the Chalk & Vermilion purchase and sale, reproductions were returned to Lublin for credit, including reproductions of Delacroix's works. Further, some Delacroix works were received under the label of another of the defendant's artists, and discovered much later, including *Grand Bal* and *Le Menage*, which were never "for sale" in October 1991, and never a part of the purchase price.

Cassanetti Affidavit at ¶ 8. This is the only statement that defendant has provided regarding the source of the 10,831 prints.[12] Ms. Cassanetti's statement does not explain when the 8,000 pieces of art were returned. Further, her conclusory statement that 8,000 of the pieces were never "for sale" under the original contract is contradicted by the plain language of the contract[13] as well as her letter to David Rogath of Chalk & Vermilion dated April 11, 1994, in which she offers him the option to purchase the Michel Delacroix "Archive" prints, *Le Grand Bal* and *Le Menage*, for a price of $3.00 each "in accordance with paragraph 4 of the agreement dated October 8, 1991, between Lublin Graphics, Inc. and Chalk and Vermillion [sic] Fine Arts." Had these prints been excluded from

---

10. William Shakespeare, *Hamlet*, III, i, 56.

11. *See* Discussion at pp. 10–11, *supra*.

12. In its Local Rule 9(c)2 statement of facts as to which defendant contends there is a genuine issue to be tried, paragraph 16, defendant states:
The material which defendant offered for sale on July 1, 1994, *was not confined to material in*

*its possession on October 8, 1991*, but included after acquired works.
(Emphasis added). Thus, from this statement, it appears that defendant is admitting that at least some of the 10,831 pieces of artwork were in fact in its possession at the time it entered in to the contract with Chalk & Vermilion.

13. *See* Note 2, *supra*.

the contract, rather than being "after-acquired artwork," they would not have been subject to the requirements of paragraph 4. Therefore, the court rejects defendant's attempts to characterize the 8,000 *Le Grand Bal* and *Le Menage* prints as never having been "for sale." Ms. Cassanetti's affidavit also fails to adequately address the source of the remaining 2,831 prints.[14]

The court finds a genuine issue of material fact as to whether there were "newly-discovered artwork" or "after-acquired artwork" and whether Chalk & Vermilion had any contract rights left to assign to plaintiff.

■■■ The one remaining problem with plaintiff's assignment theory is that it is based upon an agreement entered into two years after this lawsuit was filed. To the extent that plaintiff seeks to establish his standing to bring this lawsuit based upon this assignment, it was too late to confer standing that did not already exist. Plaintiff must show standing at the time he filed his complaint. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). Absent standing, the plaintiff could not rightfully invoke the jurisdiction of this court. *Rapaport and Benedict, P.C. v. City of Stamford*, 39 Conn. App. 492, 496, 664 A.2d 1193, 1197 (1995). The court holds as a matter of law that plaintiff may not base his standing on an assignment that occurred two years after the lawsuit was filed. Any valid claim to standing that the plaintiff may have will depend on his status as a third-party beneficiary to the 1991 agreement between Chalk & Vermilion and defendant.

## C. Third-Party Beneficiary

■■■ The only remaining basis for plaintiff to assert standing to bring this breach of contract claim against defendant is as a third-party beneficiary. A third-party beneficiary may enforce contractual obligations without being a party to the contract. Therefore, a third-party beneficiary may sue the obligor for breach. *Rapaport and Benedict, P.C., supra*, 39 Conn.App. at 496, 664 A.2d at 1196–97. The proper test to determine whether a contract creates a third-party beneficiary relationship is whether the parties intended to create a direct obligation from one party to the contract to the third party. *Gateway Co. v. DiNoia*, 232 Conn. 223, 230–31, 654 A.2d 342 (1995); *Knapp v. New Haven Road Const. Co.*, 150 Conn. 321, 325, 189 A.2d 386, 388 (1963); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F.Supp. 1362, 1373 (D.Conn. 1987). The parties' intent is to be determined from the terms of the contract read in light of the circumstances attending the making of the contract, including the motives and purposes of the parties. It is not necessary that express language in the contract create the obligation. *Andreo*, 660 F.Supp. at 1373. Moreover, contracts for the benefit of a third party are enforceable without any requirement that the promisor's performance be rendered directly to the intended beneficiary. *Stowe v. Smith*, 184 Conn. 194, 197, 441 A.2d 81, 82 (1981).

■■■ Ordinarily, the issue of contractual intent presents a question of fact for the jury, unless the language of the contract is clear and unambiguous, in which case it becomes a question of law for the court. *Gateway Co.*, 232 Conn. at 232, 654 A.2d 342.

---

**14.** Indeed, Ms. Cassanetti seems to indicate in her affidavit that she has no idea where these came from. She states:

> Reproductions were maintained by the Lublin [sic] in its storage facilities and consisted of hundreds of thousands of reproductions. Often these reproductions would be bundled in sets of one hundred in brown wrapping paper. When Lublin was able to create a demand for certain artists, and their prints, shipments would be made to art galleries requesting such reproductions. Shipments would be made in bulk. In the event galleries received fewer sales than they had in inventory, they would ask for credit, re-bundle reproduction [sic] obtained from Lublin and return for credit.... When items would be returned, they often would again be wrapped in brown and have the name of the artist, or of the artist who created the bulk of them, printed on the outside. Because the business of Lublin was selling reproductions, not counting returns, its efforts were directed towards selling, packaging and shipping rather than inspecting returned items.

Cassanetti Affidavit at ¶ 8.

Certainly, plaintiff stood to benefit from the agreement between defendant and Chalk & Vermilion, for it resulted in the termination of the litigation by defendant against plaintiff. It also allowed plaintiff to have his work marketed by his choice of publishers. It also provided a vehicle for the Cathedral Series to be published on terms other than those contained in plaintiff's annual contracts with defendant that plaintiff found unacceptable. It also resulted in the transfer of the copyrights on all of plaintiff's works to plaintiff's new publisher, which would benefit both the new publisher and plaintiff. Thus, in light of the circumstances under which the agreement was signed, it is hard to see how plaintiff could not have been an intended beneficiary of the contract between defendant and Chalk & Vermilion. Plaintiff's knowledge of the precise terms of the contract was not required. Plaintiff clearly was an intended beneficiary and is entitled to enforce the contract.

Accordingly, the court finds that plaintiff has standing to bring this action. The court denies defendant's motion for summary judgment.

### III. Plaintiff's Motion for Summary Judgment

Having determined that plaintiff had standing as a third-party beneficiary to bring this action to enforce the contract, the court now turns to the question of whether plaintiff is entitled to summary judgment as a matter of law with respect to his alleged rights to acquire the 10,831 Touchstone prints for $6,000 and his rights to require defendant to register the assignment of copyrights.

### A. Plaintiff's Rights to Acquire the 10,831 Prints

As a third-party beneficiary, plaintiff is subject to the same defenses as Chalk & Vermilion, including the fact that Chalk & Vermilion waived its right to acquire the prints when it failed to exercise its right of first refusal. As previously held, the court finds genuine issues of material fact as to whether these prints were "after acquired artwork" subject to a right of first refusal, which Chalk & Vermilion did not exercise, or whether they were "newly discovered artwork" to which the right of first refusal did not apply.

Accordingly, plaintiff's motion for summary judgment will be denied to the extent that he asks the court to declare that defendant is required to transfer the 10,831 prints to him for $6,000.

### B. Registration of the Copyright Assignments

Plaintiff also asks this court to require defendant to register the assignments of the copyrights. Plaintiff asserts in his complaint that he, or a corporation controlled by him, has received an assignment of the copyrights from defendant. It appears, however, from the facts set forth in the affidavits filed in support of the motions for summary judgment that defendant actually assigned the copyrights to Chalk & Vermilion, which later assigned them to plaintiff. Plaintiff claims that, although he has received the assignments, defendant has failed to register these assignments with the U.S. Copyright Office. Defendant counters that it delivered to Chalk & Vermilion all Certificates of Copyright that it had obtained on the Delacroix artwork, and executed and delivered the transfer documents requested by the Chalk & Vermilion's attorneys at the closing on the 1991 agreement. Plaintiff has responded that, while he does not dispute that certificates of copyright were delivered to Chalk & Vermilion, the written assignments were not in the form necessary for filing with the U.S. Copyright Office.

Neither party has provided the court with copies of the assignments or documents of transfer that were provided to Chalk & Vermilion by defendant. Therefore, the court cannot determine whether these were in the proper form or not. The Copyright Act, 17 U.S.C. § 204(a), requires that a transfer of ownership be in writing and signed by the owner of the rights conveyed or the owner's duly authorized agent. A document transferring ownership may be recorded in the Copyright Office if the document bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original,

signed document. 17 U.S.C. § 205(a). The statutory requirements for recordation are quite simple and straight-forward.

▮ In the 1991 contract, defendant agreed to transfer, sell and assign to Chalk & Vermilion any and all copyrights to all artwork of Michel Delacroix in its possession, (paragraph 1.A.), and to provide

> such further documentation ... as [Chalk & Vermilion] may request, including formal assignments of copyrights referred to at "A" above, and formal assignments or other documents evidencing [defendant's] assignment to [Chalk & Vermilion] of any rights it may have to apply for other copyrights with respect to the artwork sold hereunder.

(Paragraph 1.E.). It is unclear from plaintiff's motion for summary judgment in what manner defendant allegedly has not complied with the contractual or statutory requirements. It may turn out that defendant has complied and that plaintiff's difficulties lie with Chalk & Vermilion, against whom he would have to pursue a separate action.

The court finds that under the contract Chalk & Vermilion was entitled to receive from defendant proper documentation of the copyright assignments, such that the assignments could be registered with the U.S. Copyright Office. On the record before the court, however, the court cannot hold as a matter of law whether the documentation provided by defendant was sufficient. Therefore, the court must deny plaintiff's motion for summary judgment on the issue of whether defendant is required to provide additional documentation for the recordation of the copyright assignments with the U.S. Copyright Office.

### Conclusion

For the reasons discussed above, defendant's motion for summary judgment (**Doc. # 26**) as to plaintiff's standing is DENIED.

Plaintiff's motion for summary judgment (*Doc. # 22*) on his breach of contract claim and his entitlement to receive additional documentation of the copyright assignments is DENIED.