**THE DETROIT INSTITUTE OF ARTS FOUNDERS SOCIETY, d/b/a Detroit Institute Of Arts, Plaintiff,**

v.

**Christopher S. ROSE, individually and as Executor of the Estate of Margaret Skewis Rose, James P. Rose, Rufus R. Rose, and Mildred Smith, Executrix of the Estate of Robert "Buffalo Bob" Smith, Defendants.**

**No. CIV. A. 3:99CV00221(CFD).**

United States District Court,
D. Connecticut.

Jan. 23, 2001.

Stuart D. Rosen, Michael P. Ungaro, Bingham Dana, Hartford, CT, Gregory D. Hanley, Mark A. Stern, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Plaintiff.

Frank N. Eppinger, O'Brien, Shafner, Stuart, Kelly & Morris, Groton, CT, Mark E. Block, O'Brien, Shafner, Stuart, Kelly & Morris, P.C., Norwich, CT, Stephen J. Grabenstein, Van Winkle, Buck, all, Starnes & Davis, PA, Asheville, NC,

Frank J. Libert, Susan Mara Phillips, Morris James Busca, Suisman, Shapiro, Wool Brennan, Gray & Greenberg, New london, CT, for Defendants.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

DRONEY, District Judge.

## I. Introduction and Factual Background

"The Howdy Doody Show" was a television program beloved by millions of children now known as "the baby boom generation." It was produced and broadcast by the National Broadcasting Company, Inc. ("NBC") from 1947 to 1960. Hosted by Robert "Buffalo Bob" Smith, the show's main character was Howdy Doody, a puppet in the image of a freckled-faced boy in cowboy clothing. For most of its run, the show aired every afternoon after school. In that era, television programming—especially for children—was very limited, which contributed to the show's immense popularity.

This lawsuit arises out of a dispute over the ownership of the revered and now valuable Howdy Doody puppet.

### A. Background [1]

The first Howdy Doody puppet that appeared on "The Howdy Doody Show" looked very different from the character that became so popular. The show's production team thought this first Howdy Doody was unappealing and later referred to it as the "Ugly Howdy." In 1948, NBC commissioned a well-known puppet maker, Velma Dawson, to build a new Howdy Doody to replace the Ugly Howdy. On June 3, 1948, NBC purchased the new puppet from Dawson, and this puppet be-

came the Howdy Doody character on the show.

During the thirteen years and over two thousand shows that "The Howdy Doody Show" was on the air, several other Howdy Doody puppets were created. "Double Doody," a puppet nearly identical to Howdy Doody, served as a stand-in on the show when repairs were made to Howdy Doody. "Photo Doody," a puppet without strings, was used for public appearances and photo opportunities.[2] Finally, puppets referred to as the "Canadian Howdys" were created for a version of "The Howdy Doody Show" that aired in Canada.

Most of these Howdy Doodys, like the many other puppets used in the show, were maintained and operated by several puppeteers, including Rufus C. Rose[3] and his wife, Margaret ("Margo") Rose. Beginning in 1952, Rufus Rose served as the puppet master, puppeteer, and caretaker for many of the puppets that appeared on the American broadcast of the "The Howdy Doody Show." He also created some puppets and made repairs at his workshop in Waterford, Connecticut. While the American show was on the air, Rufus Rose received $75.00 per week from NBC for "storing and servicing" the puppets at his workshop as part of his compensation. Like her husband, Margo Rose repaired puppets that appeared on the show; she also designed some of the show's characters and modeled and painted their heads.

When "The Howdy Doody Show" went off the air in December 1960, Rufus Rose ended his employment by NBC but kept possession of many of the puppets used in the show, including Howdy Doody, Double Doody, and the Canadian Howdys. Pursuant to an informal agreement made at the end of the show's run with Roger Muir, the show's executive producer, Rufus Rose

---

**1.** The recited facts are taken from the parties' Local Rule 9(c) statements and the materials appended thereto, and are undisputed unless otherwise noted.

**2.** Other puppets on the show that aired in the United States included Phineas T. Bluster,

Flub–a–Dub, Dilly Dally, and John J. Fedoozle.

**3.** One of Rufus C. and Margo Rose's sons, a defendant in this action, is named Rufus R. Rose. For the purposes of this opinion, "Rufus Rose" refers to the father.

continued to store the puppets in his Connecticut workshop until final arrangements were made for them.[4]

On April 23, 1961, a fire occurred at Rufus Rose's workshop and some of the puppets were damaged. Fortunately, Howdy Doody apparently escaped serious harm. NBC, with its insurance carrier, sued Rufus Rose in Connecticut state court for allowing the puppets to be damaged.

Shortly after the lawsuit with NBC concluded in late 1965 in favor of Rufus Rose,[5] he began a series of correspondence with NBC about payment for his maintenance and storage of the puppets since the end of the show in 1960, and about the future of the puppets, including Howdy Doody.[6] In a June 3, 1966 letter to NBC General Manager William J. Schmitt, Rufus Rose proposed that: (1) NBC pay him for the storage and upkeep of all the puppets since the end of the show; (2) NBC allow him to keep the minor puppets (but with the understanding that he would not use them as Howdy Doody show characters); and (3) the main puppets from the show, including Howdy Doody, be turned over to a museum known as the Detroit Institute of Arts ("DIA"). Rufus Rose indicated in his letter that the DIA "houses the recognized museum of Puppetry in America." Schmitt turned Rose's letter and the mat-

ter over to Howard Singer of NBC's legal department.

On March 20, 1967, after some negotiations, Singer sent Rufus Rose a proposed general release and a cover letter which set forth an amount for the past storage and maintenance fees, agreed that Rose would send Howdy Doody to the DIA, and agreed that Rose could keep the "minor puppets."[7] Rose returned the executed release with a cover letter on March 23, 1967.[8]

For the next few years, Rufus Rose kept the Howdy Doody puppet at his Waterford workshop.

The next chapter in the travels of Howdy Doody began in 1970. In response to a request from his friend Buffalo Bob, who was then making public appearances throughout the country in his role from the show, Rufus Rose agreed in a letter to send Howdy Doody to Buffalo Bob. In that letter, dated September 11, 1970, Rufus Rose explained to Buffalo Bob that he had agreed with NBC that the puppet would "eventually" be placed in the DIA, and it never would be used in a commercial manner. Rufus Rose went on to say that he was sending the "one and only original HOWDY DOODY" to Buffalo Bob "with this mutual understanding and responsibility." Rufus Rose died in 1975, while Howdy Doody was still in Buffalo Bob's posses-

---

4. Rose acknowledged that NBC owned all the puppets at that time. For example, in a letter to NBC dated October 31, 1961, Rufus Rose stated that it was his "clear understanding" that all of the puppets, including Howdy Doody, were still owned by NBC, not by him.

5. In *National Broadcasting Co. v. Rose,* the Supreme Court of Connecticut held that the trial court did not err in finding that Rufus Rose had not been negligent as a gratuitous bailee of the puppets. *See* 153 Conn. 219, 215 A.2d 123 (1965).

6. Rufus Rose and NBC exchanged six letters after the conclusion of the state litigation. The three letters that are most pertinent to the Court's consideration of the parties' cross-motions for summary judgment and constitute the agreement between the parties are

discussed in more detail in the text which follows.

7. Singer also asked to be informed which puppets, in addition to Howdy Doody, would be sent to the museum.

8. It is not clear when the DIA learned of this agreement between Rufus Rose and NBC. According to the DIA, Rufus Rose and Margo Rose were friendly with one of its curators and the museum's conservator of puppets. Given this apparent friendship, it seems likely that the DIA knew about it when it was made. Nevertheless, the parties agree that by 1992, no one who was then employed by DIA was aware of the museum's interest in the puppet. That year, the DIA was alerted by a letter that it received from Buffalo Bob's attorney.

sion. Through the next fifteen years or so, Buffalo Bob kept Howdy Doody and used him in his public appearances.

Beginning in 1992, Buffalo Bob's attorney, Edward Burns, wrote to NBC, Margo Rose (Rufus Rose's widow), and the DIA, requesting that they waive the requirement that Howdy Doody be placed in the DIA. Burns indicated that Buffalo Bob had fallen on difficult financial times, and now wished to sell the puppet and keep the proceeds. In a reply written on behalf of his mother, Margo Rose, Christopher Rose stated that it was his father's intention that Buffalo Bob honor the "condition" that Howdy be given to the DIA. NBC wrote Buffalo Bob that it also refused to release Howdy Doody to him. The DIA also declined to allow Buffalo Bob to sell the puppet. As a result, in a July 24, 1995 letter, Buffalo Bob informed the DIA that he would transfer Howdy Doody to the museum when he no longer wished to keep the puppet.

Eventually, Buffalo Bob and Christopher Rose changed their minds about Howdy Doody.[9] On April 19, 1998, they executed an agreement to sell the puppet and split the profits.[10] Howdy Doody was turned over by Buffalo Bob to Christopher Rose at that time, with the understanding that if it were not sold by June 1, 1999, it would be returned to Buffalo Bob under the terms of his original agreement with Rufus Rose from 1970.

In May 1998, Christopher Rose and Buffalo Bob amended their earlier agreement to recite specifically that each then owned a fifty percent interest in the puppet, and they "certified" that Christopher Rose had received from Buffalo Bob the "original

Howdy Doody puppet that was used on over 2300 Howdy Doody T.V. shows." According to the DIA, on June 19, 1998, Christopher Rose entered into a consignment agreement with Leland's Collectibles, Inc., an auction house, for the sale of the "original Howdy Doody" and other puppets from "The Howdy Doody Show." A few days later, Buffalo Bob died. The DIA then brought this case to prevent the Rose family from selling the puppet and also to gain possession of it.[11]

During the course of discovery in this action, this Court permitted an inspection of the Howdy Doody puppet that was transferred from Rufus Rose to Buffalo Bob and then to Christopher Rose. This inspection was conducted on December 14, 1999, and was overseen by Alan Semok, a maker and restorer of puppets who had repaired Howdy Doody while it was in Buffalo Bob's possession. Velma Dawson, who created the Howdy Doody puppet that debuted in 1948, attended the inspection, but she could not identify the head of that puppet as the head that she had constructed for NBC in 1948. However, she later submitted an affidavit stating that her initial conclusion was mistaken and that she believed the head that she examined during the inspection to be her work.

## B. The Lawsuit Here

The plaintiff in this case is the DIA. The defendants are Christopher Rose, both individually and as executor of his mother's estate; his two brothers, James and Rufus R. Rose; and Mildred Smith, Buffalo Bob's widow and the executrix of his estate.[12]

---

9. Perhaps important is that in October 1997, Photo Doody sold at auction for $113,000. *See* Deposition ("Dep.") of Joshua Leland Evans, at 222.

10. Margo Rose died in 1997, and Christopher was named executor of her estate.

11. The Howdy Doody puppet at issue in this case is currently stored in a bank vault in Rhode Island, per the parties' agreement.

12. This Court has jurisdiction under 28 U.S.C. § 1332, as there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000. The parties do not contest the Court's jurisdiction in this matter. The parties also agree that Connecticut law substantive applies.

The DIA's first amended complaint requests several forms of relief.[13] First, as to all the defendants, the plaintiff DIA seeks a declaration that it is the owner of the puppet and a grant of permanent possession (claim one), and damages for conversion (claim two), civil theft (claim three), violation of the Connecticut Unfair Trade Practices Act, ("CUTPA"), Conn. Gen.Stat. § 42–110b, *et seq.*, (claim five), and breach of contract based on the 1998 agreement between Buffalo Bob and Christopher Rose to auction Howdy Doody (claim seven). As to the defendant Christopher Rose, the amended complaint also seeks damages for tortious interference with contract (claim four). Finally, as to the defendant Mildred Smith, the plaintiff also seeks damages for breach of contract based on the 1970 letter of Rufus Rose to Buffalo Bob (claim six).

Pending is the Rose defendants' motion for summary judgment [Document # 71], defendant Mildred Smith's motion for summary judgment [Document # 74], and the plaintiff's motion for partial summary judgment [Document # 77]. The arguments of each of these motions are first summarized below, then addressed in detail.

### C. Plaintiff's Motion for Partial Summary Judgment

The DIA argues that it was a third party beneficiary of the 1966–1967 agreement between NBC and Rufus Rose and thus is entitled to ownership of Howdy Doody. It seeks summary judgment as to its first claim for possession and ownership of Howdy Doody. The DIA further contends that the affirmative defenses advanced by the defendants are unsupported by the evidence or law, and as a result, it is entitled to summary judgment on those as well.[14]

### D. Rose Defendants' Motion for Summary Judgment

In their motion for summary judgment, the Rose defendants argue that the Howdy Doody puppet at issue in this case is not the original Howdy Doody, and consequently, that the DIA is not entitled to it. They contend that the "original" Howdy Doody should be defined as the puppet with the head made by Velma Dawson in 1948, and that the evidence does not conclusively establish at this juncture that Dawson created the head of the puppet at issue in this case.[15]

The Rose defendants also argue: (1) the DIA is not entitled to Howdy Doody because the DIA was not a third party beneficiary of the 1966–1967 agreement be-

---

13. The operative complaint is the first amended complaint.

14. The affirmative defenses asserted by Mildred Smith and the Rose defendants include: (1) the plaintiff failed to state a claim upon which relief can be granted; (2) the plaintiff's action is barred by laches; (3) the DIA's claim of ownership is defeated by the Statute of Wills, Conn. Gen.Stat. § 45a–250 *et seq.*; (4) the agreement between Rufus Rose and NBC violates the Statute of Frauds, Conn. Gen. Stat. § 52–550; (5) Buffalo Bob was released from the condition that he deliver Howdy Doody to the DIA when he returned the puppet to the Rose family; (6) Rufus Rose's promise to deliver Howdy Doody to the DIA was not supported by consideration and thus was void; and (7) to the extent that Rufus Rose intended to make a gift of Howdy Doody to the DIA, the gift was incomplete and thus

unenforceable. The Rose defendants independently advance the following additional affirmative defenses: that Rufus Rose's promise to deliver a Howdy Doody puppet was fulfilled by Margo Smith's donation of Double Doody to the Smithsonian; that the Howdy Doody at issue in this case does not have the head created by Velma Dawson in 1948; and that the Howdy Doody at issue in this case is not the original Howdy Doody puppet. The Smith estate independently advances the following additional affirmative defenses: that the plaintiff's CUTPA claim fails to state a cause of action; and that Mildred Smith does not possess any puppet to which the first amended complaint refers.

15. Presumably, the Rose Defendants' position is that if the puppet is not the "original," it would fall into the group of other puppets that NBC permitted Rufus Rose to keep.

tween Rufus Rose and NBC or the 1970 agreement between Rufus Rose and Buffalo Bob; (2) Rufus Rose did not make a gift of Howdy Doody to the DIA; and (3) Buffalo Bob was under no obligation to deliver Howdy Doody to the DIA. Based on these arguments, the Rose defendants further claim that Christopher Rose is entitled to summary judgment on the DIA's claim of tortious interference with contract.

### E. Defendant Mildred Smith's Motion for Summary Judgment

In her motion for summary judgment, Mildred Smith, as executrix of the estate of Buffalo Bob, incorporates the arguments of the Rose defendants' motion, and advances several of her own. First, she argues that Buffalo Bob returned Howdy Doody to Christopher Rose, and as a result, his estate cannot be liable for conversion or breach of any contract. She also asserts that she is entitled to summary judgment on the plaintiff's civil theft claim because Buffalo Bob believed that he had a valid claim of ownership to Howdy Doody. Further, she contends that Buffalo Bob's estate cannot be liable under CUTPA, because Buffalo Bob never engaged in trade or commerce involving the Howdy Doody puppet in Connecticut.

## II. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.' " *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.

1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). Additionally "where ... the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir.1999) (citing *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548 and *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998)).

## III. Discussion

### A. Present Ownership of Howdy Doody

The DIA argues that there is no genuine issue of material fact that it is the owner of Howdy Doody under the 1966–1967 agreement between Rufus Rose and NBC, and as such, it is entitled to possession of the puppet.[16] The defendants make several arguments that dispute this claim in their

---

**16.** The DIA asserts that it is entitled to summary judgment on its claim for declaratory

relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

motion for summary judgment and their opposition memorandum.[17] First, they contend that there is a genuine issue of material fact that the Howdy Doody at issue in this case is the original Howdy Doody, and as a result, that the DIA is not entitled to the puppet. Second, they argue that the language of the 1966–1967 agreement between NBC and Rufus Rose is ambiguous and not enforceable, at least without a trial. Third, they contend that the 1966–1967 agreement did not require Rufus Rose to deliver Howdy Doody to the DIA as a third party beneficiary. Fourth, they contend that the 1970 agreement between Rufus Rose and Buffalo Bob was not binding on Buffalo Bob. Each argument will be discussed below.

### 1. What Is the "Original" Howdy Doody?

The defendants argue in their motions for summary judgment that the definition of the "original" Howdy Doody is critical. They contend that the DIA, if it has any claim, has one only to the Howdy Doody puppet with the head created by Velma Dawson in 1948. They argue that the puppet that is the subject of the plaintiff's claim, now in the Rhode Island bank vault, is not the original Howdy Doody under this definition, and thus the DIA is not entitled to possession of it. At the very

least, the defendants argue, there is a genuine issue of material fact of whether the puppet now in the bank vault is the original Howdy Doody, and they believe that this issue should be left to a jury to decide. In contrast, the DIA argues that the Howdy Doody referred to in the 1966–1967 agreement is the one in the Rhode Island bank and the one understood to be the original by Rufus Rose and NBC at the time of that agreement.

### a. The Materiality of Howdy Doody's Present Condition

In its first amended complaint, the plaintiff refers to the Howdy Doody puppet at the center of this dispute as the "Original Howdy," and defines "Original Howdy" as "what was commonly considered and/or known by Rufus C., Buffalo Bob, and others to be the original Howdy Doody puppet," *when the show went off the air in 1960.*[18] The defendants maintain that this definition is not appropriate. They argue that the term "Original Howdy" should be defined as the puppet with the head created by Velma Dawson in 1948, not simply the one considered to be the original by Rufus Rose, Buffalo Bob and others after the show ended. The definition preferred by the defendants, however, is not warranted because the is-

---

**17.** As discussed in Section I.E., the Smith estate adopts and incorporates the arguments set forth in the Rose defendants' summary judgment motion and related papers. However, the Smith estate expands upon the Rose defendants' arguments relating to the present ownership of Howdy Doody, asserting that: (1) Buffalo Bob cannot be liable to the DIA because no express promise was made by Buffalo Bob to Rufus Rose; (2) it is unclear which Howdy Doody puppet Rufus Rose promised to give to the DIA; and (3) Rufus Rose's plan to give Howdy Doody to the DIA did not rise to the level of a legally binding transaction.

**18.** *See* Amended Complaint, at ¶ 11. The defendants point out that the plaintiff used a different definition of "original" in other statements and representations made earlier in this case. For example, in the plaintiff's initial complaint, "Original Howdy" is de-

fined as "a marionette puppet" that "became one of the most famous puppets in history" and was "the central figure in the 'Howdy Doody Show.'" In its memorandum of law in support of plaintiff's motion to permit inspection, the plaintiff argued that the inspection was necessary because "[t]he head of the original Howdy was made by Velma Dawson." Similarly, in its motion for summary judgment, the DIA states that "[t]he Dawson puppet ... was commonly known and referred to as the original Howdy Doody puppet" and "[t]he head of the Original Howdy ... was never replaced." However, "[i]t is well settled that an amended pleading ordinarily supersedes the original and renders it of no legal effect." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir.2000). Thus, the definition of "Original Howdy" contained in the DIA's first amended complaint—which is now the operative complaint—controls.

sue on which it is based—whether Howdy Doody has the head made by Velma Dawson in 1948—while disputed, is not material to the outcome of this case.

Only disputes over material facts, or those that "might affect the outcome of the suit under the governing law," will preclude the entry of summary judgment. *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 23 (2d Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Substantive law dictates which facts are material. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 572 (2d Cir. 1993). Here, the fact that Howdy Doody's head may have changed or been repaired since it was first created in 1948 to the time the show went off the air in 1960 is not a fact that will affect the outcome of this case, and thus is not material. Instead, it only matters that the Howdy Doody puppet at issue here is the same one that was the subject of the agreement between Rufus Rose and NBC in 1967, and the one that was passed on to Buffalo Bob and later to Christopher Rose. The plaintiff has produced evidence to establish these facts beyond doubt.

The chain of custody of the Howdy Doody puppet from the end of the show in 1960 when Rufus Rose stored it at his Waterford workshop, during the time of the Rose/NBC agreement in 1966 and 1967, when it was sent to Buffalo Bob in 1970, and then to Christopher Rose in 1998, and finally to the Rhode Island bank was unbroken. In other words, the Howdy Doody in the Rhode Island vault is the same puppet to which Rufus Rose, NBC, and Buffalo Bob referred from the end of the show forward.[19] The defendants have not produced sufficient evidence to raise a genuine issue of whether this puppet is not the one that Rufus Rose and NBC intended to be subject to the 1966–1967 agreement and the same one subsequently possessed by Rufus Rose, Buffalo Bob, and then Christopher Rose.[20]

In addition, when Rufus Rose and Buffalo Bob referred to the Howdy Doody puppet, they never questioned its authenticity or that it was the one subject to the 1966–1967 agreement with NBC. In his 1970 letter to Buffalo Bob, Rufus Rose indicated that he was sending Buffalo Bob the puppet that was the subject of the 1966–1967 agreement and was promised to the DIA. He also refers to this puppet as the "the one and only original HOWDY DOODY." It is clear from that letter and subsequent documents that both believed the Howdy Doody that Rufus Rose sent to Buffalo Bob in 1970 was the original puppet, however repaired or modified during the years of the show. From 1970 forward, the term "original" was used to designate this puppet, and many key individuals referred to it in this way.

For example, Buffalo Bob and his attorney, Edward Burns, acknowledged on a number of occasions that Buffalo Bob still had custody of that Howdy Doody puppet. In Burns' 1993 letter to Margo Rose, he stated that "Rufus Rose transferred to

---

**19.** In their motion for summary judgment, even the Rose defendants state that the puppet in the bank vault is the same one that Rufus Rose sent to Buffalo Bob. However, they also cite the deposition testimony of Roger Muir as evidence that parts of Howdy Doody were replaced during the show. *See* Muir Dep. at 27-28. Muir characterizes the puppet in this case as a "composite Howdy." Id. at 28. This evidence, however, concerns the time period before the 1966–1967 agreement between Rufus Rose and NBC.

**20.** The defendants cite the deposition testimony of Christopher Rose, DIA Associate Curator Lawrence Baranski, and NBC representative Lawnlia Grant, as examples of individuals who considered the original Howdy to be the one with the head created by Dawson. *See* Dep. of Christopher Rose at 31; Dep. of Lawrence Baranski at 73; and Dep. of Lawnlia Grant at 17. This evidence is not availing because it does not challenge whether the Howdy Doody at issue in this case is the same puppet that was the subject of the agreement between NBC and Rufus Rose, and was subsequently passed on to Buffalo Bob and Christopher Rose.

Bob ownership of the original Howdy Doody puppet." Burns made similar representations in his letters to NBC and the DIA. In a 1980 letter to the Smithsonian Institution regarding her donation to it of Double Doody, Margo Rose indicated that she too believed that the puppet then in the possession of Buffalo Bob was the puppet that Rufus Rose considered to be the original. She also explained that Double Doody's hands were taken from "the original Howdy made by Velma Dawson, now in possession of Bob Smith," which confirms that some changes were made to the Velma Dawson puppet during the life of the show. Finally, in his 1993 letter to Buffalo Bob, Christopher Rose acknowledged that Buffalo Bob possessed the puppet his father considered the original.

This puppet—the one then in Buffalo Bob's custody and understood by the parties to be the original—was passed to Christopher Rose in 1998, but only after Buffalo Bob and Christopher Rose certified that Buffalo Bob had given the "Original Howdy Doody" to Christopher Rose in anticipation of its sale at auction. Christopher Rose made a similar acknowledgment in his agreement with Leland's Collectibles, Inc.

### b. The Dawson Inspection

The defendants point to the Dawson inspection in this case in December 1999, as well as the fact that Alan Semok reported that the inside of Howdy's head contained an inscription "Made by Scott Brinker," [21] to show that a genuine issue of material fact exists as to whether the puppet here is the original Howdy Doody. They also point to the changing views of the plaintiff in this case as to whether the Howdy Doody here has the same head now as in

1948. At best, this indicates the surprise of the parties here that the Howdy Doody at issue in this case may not still have had the head built by Dawson in 1948 at the end of the show in 1960 and when Rufus Rose and NBC agreed to its future in 1966–1967, or perhaps that the head had been repaired by those other than Ms. Dawson during the show's run. It also shows that memories may have faded as to how much repair work was done to Howdy Doody during the years 1948 to 1960. However, there is no evidence that the puppet at the center of this dispute is not the same puppet considered by Rufus Rose, Buffalo Bob, and others to be the original from 1960 forward, or that it was not the puppet promised to the DIA in the 1966–1967 agreement.[22]

### c. Conclusion

The puppet that is at the center of this controversy perhaps is not comprised of all the same parts that it had when Velma Dawson made it in 1948, and portions of its body may very well have been replaced or repaired during the thirteen years that the show was on the air. There also may be a question as to whether Howdy Doody had the same head in 1960 when the show closed as it had in 1948, or whether the original head had been repaired in those intervening years. However, there is no genuine issue of material fact that the Howdy Doody puppet which existed at the end of the show, and was intended to be the subject of the 1966–1967 agreement between Rufus Rose and NBC, is the same as the one now in the bank vault in Rhode Island. The defendants have not presented any significant evidence to the contrary.[23]

---

**21.** Scott Brinker was another puppeteer who worked on "The Howdy Doody Show." He also created and repaired puppets.

**22.** Defendants also seem to suggest that Rufus Rose may have significantly altered this puppet after the show ended in 1960, but this suggestion is without evidentiary support.

**23.** This conclusion also indicates that the plaintiff is entitled to summary judgment as to the Rose defendants' ninth and tenth affirmative defenses, both relating to the issue of the "original" Howdy.

2. The Agreement between NBC and Rufus Rose in 1966–1967

The DIA argues that it is entitled to summary judgment on the issue of ownership of Howdy Doody because it is a third party beneficiary of the 1966–1967 agreement between NBC and Rufus Rose. In contrast, the Rose defendants argue that there was no binding agreement between NBC and Rufus Rose as to the future of Howdy Doody. They also contend that there are ambiguities and disputed facts regarding the interpretation of this agreement, including whether the DIA was a third party beneficiary and whether NBC required delivery of the puppet to the DIA. Further, the Rose defendants assert that Rufus Rose became the owner of Howdy Doody at the time of the 1966–1967 agreement.[24]

At the outset of the discussion concerning the 1966–1967 agreement, it is important to set out certain basic principles of contract law and how they apply to third party beneficiaries of contracts. They will then be applied to this situation.

a. Contracts to Benefit a Third Party

i. General Contract Law

 The existence of a contract, at least initially, is a question of fact. *See Simmons v. Simmons,* 244 Conn. 158, 708 A.2d 949, 963 (1998). To be enforceable, a contract must "be definite and certain as to its terms and requirements." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 749 (2d Cir.1998) (quotation omitted); *Suffield Development Associates v. Society for Savings,* 243 Conn. 832, 708 A.2d 1361, 1366 (Conn.1998). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appro-

priate remedy." Restatement (Second) of Contracts § 33 (1981); *cf. Parks v. Baldwin Piano & Organ Co.,* 262 F.Supp. 515, 519 (D.Conn.); *aff'd* 386 F.2d 828 (2d Cir. 1967) (holding that an agreement "devoid of the fundamental requisite of mutuality of obligation" was indefinite and did "not constitute a binding contract for breach of which an action for damages may be maintained"). Nevertheless, "[c]ourts very reluctantly reject an agreement regularly and fairly made as unintelligible or insensible." *Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 378 A.2d 538, 540 (1977) (quotation omitted). "[A]n agreement will not be rejected if the missing terms can be ascertained, either from its express terms or by fair implication." *See Presidential Capital Corp. v. Reale,* 231 Conn. 500, 652 A.2d 489, 493 (1994) (citing *Augeri,* 378 A.2d at 540).

For instance, "[w]here no time for the performance of a contract is contained within its terms, the law presumes that it is to be performed within a reasonable time." *Schlicher v. Schwartz,* 58 Conn. App. 80, 752 A.2d 517, 521 (2000) (quotation omitted); *see also Northeast Elec. Contractors v. Udolf,* 1 Conn.App. 169, 469 A.2d 419, 420 (1984). "What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends upon the subject matter of the contract, the situation of the parties, their intention and what they contemplated at the time the contract was made, and the circumstances attending the performance." *Robinson v. Commercial Contractors, Inc.,* 6 Conn.Cir.Ct. 398, 274 A.2d 160, 162 (1970) (quoting 17 Am.Jur.2d Contracts § 330). The particular amount of time to be considered reasonable is a question of fact ordinarily determined by

---

24. Alternatively, the defendants suggest that the agreement between Rufus Rose and NBC may constitute a bailment. A bailment "involves a delivery of the thing bailed into the possession of the bailee, under a contract to return it to the owner according to the terms of the agreement." *B.A. Ballou & Co., Inc. v. Citytrust,* 218 Conn. 749, 591 A.2d 126, 129

(1991) (quotation omitted). The defendants further argue that due to the uncertainty of the terms of the bailment, it created no obligation for Rufus Rose, as bailee, to deliver Howdy Doody to the DIA. However, given that a bailment is a contractual relationship, the analysis in the text would apply, and the outcome would be the same.

the trier. *See Christophersen v. Blount,* 216 Conn. 509, 582 A.2d 460, 463 (1990) (applying this rule with respect to a condition precedent).

"In the fact of ambiguity, the court must defer to a jury to determine the intent of the parties." *Topf v. Warnaco, Inc.,* 942 F.Supp. 762, 767 (D.Conn.1996). "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (applying New York law). However, language is not ambiguous merely because the parties may offer interpretations that conflict. *See Orange Improvements Partnership v. Cardo, Inc.,* 984 F.Supp. 85, 89 (D.Conn.1997) (citing *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985)). In contrast, "[c]ontract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Brunoli v. Fred Brunoli & Sons,* 993 F.Supp. 66, 73 (D.Conn.1997) (quoting *Care Travel Co. v. Pan Am. World Airways,* 944 F.2d 983, 988 (2d Cir.1991)). Although contract interpretation involving issues of the parties' intent presents questions of fact, when contract language is definite, the determination of the parties' intent is a question of law. *See Orange Improvements,* 984 F.Supp. at 90 (citation and quotation omitted).

In contract actions involving the interpretation of contractual language, summary judgment is appropriate only when the language of a contract is wholly unambiguous when considered in light of the surrounding circumstances and undisputed evidence of intent. *See id.* at 89 (citing *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995)). The moving party has the burden of establishing that the language of the contract is not susceptible to at least two fairly reasonable meanings. *See id.* If that party cannot establish unambiguous contract language, a material issue exists as to the parties' intent and the non-moving party may introduce extrinsic evidence on that issue at trial. *See id.* (citing *Wards Co.,* 761 F.2d at 120).

 In addition to clear and definite terms, a contract also must be supported by valuable consideration to be enforceable. *See Connecticut Nat'l Bank v. Voog,* 233 Conn. 352, 659 A.2d 172, 179 (1995). However, a contract is not unenforceable merely because its consideration is inadequate or disproportionate. *See Osborne v. Locke Steel Chain Co.,* 153 Conn. 527, 218 A.2d 526, 530 (1966). An exchange of promises is sufficient consideration to support a contract, *see id.* at 531, but these promises must be capable of performance and the performance must be possible. *See Lebowitz v. McPike,* 157 Conn. 235, 253 A.2d 1, 6 (1968).

ii Third–Party Beneficiary Contracts

 Two parties may enter into a contract to benefit a third party beneficiary who is then entitled to enforce contractual obligations without being a party to the contract and thus may sue the obligor for breach. *See Delacroix v. Lublin Graphics, Inc.,* 993 F.Supp. 74, 83 (D.Conn.1997). To be valid, there need not be express language in the contract creating a direct obligation to the third party beneficiary. *See Grigerik v. Sharpe,* 247 Conn. 293, 721 A.2d 526, 536 (1998) (quoting *Knapp v. New Haven Road Constr. Co.,* 150 Conn. 321, 189 A.2d 386, 389 (1963)). However, a contract can only result in an obligation to a third party if both parties to the contract intended to created a direct obligation from the promisor to the third party. *See Grigerik,* 721 A.2d at 536. In other words, the fact a third party may gain an incidental benefit is not enough to support third-party beneficiary status. *See id.* at 538 n. 16. The intent of the parties is to be "determined from the terms of the contract read in light of the circumstances attend-

ing the making of the contract, including the motives and the purposes of the parties." *Delacroix,* 993 F.Supp. at 83.

To recover on a contract made for his benefit, the third party beneficiary need not consent to the contract, as long as he or she knows of the contract and accepts it when he or she begins an action to enforce it. *See Data Gen. Corp., Inc. v. Citizens Nat'l Bank,* 502 F.Supp. 776, 785 (D.Conn. 1980). Generally, a third party beneficiary is subject to the defenses that the promisor could raise in a suit by the promisee. *See Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 313 (2d Cir.1990) (discussing the collective bargaining exception to this rule under New York law). The parties to a contract to benefit a third party may discharge or alter the promisor's obligations under that contract if the terms of the original agreement do not prohibit such changes, the third party has not relied upon the contract, or the third party has not yet brought suit based on the contract. *See* Restatement (Second) of Contracts § 311. Any modification of such a contract must be accomplished by a subsequent agreement between the parties. *Id.*

b. The Agreement in this Case

■ The plaintiff has produced evidence to establish as a matter of law that three of the letters between Rufus Rose and NBC from 1966 and 1967 created a binding contract.[25] The evidence also shows that the parties agreed that Rufus Rose would transfer Howdy Doody to the DIA, a third party beneficiary of the contract. Although the parties did not specify *when* this transfer would occur, a reasonable

time for such performance is implied by law, and thus the DIA is now entitled to Howdy Doody. The three letters which constitute this contract are discussed below.

Rufus Rose's June 3, 1966, letter to NBC General Manager William J. Schmitt followed the Connecticut Supreme Court's decision of November 30, 1965, which affirmed the trial court judgment in Rose's favor as to his care of the puppets which had been damaged in the fire. In that June letter, Rose first proposes that the NBC litigation be "finally resolved" and then proposes that NBC pay him $11,062.50 for his storage and maintenance of the puppets at his Waterford workshop since 1960.[26]

As to the future of all the puppets, Rufus Rose made the following proposal in his letter:

In the matter of the final disposition of the HOWDY DOODY puppets I would like to propose that the main characters such as HOWDY DOODY, MR. BLUSTER, DILLY DALLY, JOHN J. FEDOOZLE, FLUB–A–DUB and several others, be turned over to the Detroit Art Institute wich [sic] houses the recognized museum of Puppetry in America.... As for the balance of the puppets, many of which have considerable fire damage, I feel they have little if any commercial value. However, I could use them up in my own future private work, without of course keeping or using their identities as HOWDY DOODY characters, if you would allow.

Oral and written negotiations over the course of the next few months apparently

---

**25.** As previously discussed, six letters were exchanged between Rufus Rose and NBC. The three that formed the basis of their contract are discussed in the text. Two other letters from Singer to Rose, dated November 15 and 21, 1966, provide evidence of the parties' negotiations as to the amount of NBC's payment to Rose for his storing and maintaining the puppets from the show. The other letter was written by Singer to Rose on March 27, 1967, and accompanied NBC's check to Rose.

It confirmed receipt of the general release and wished Rufus Rose well in his future endeavors.

**26.** Rufus Rose computed the amount of $11,062.50 by multiplying the number of weeks since 1960 when the show went off the air (295) times $37.50 (one-half the $75.00 weekly fee he was paid while the show was on the air).

concerned the amount to be paid to Rufus Rose for the storage fees, and the disposition of puppets other than Howdy.[27] NBC's Howard Singer wrote to Rufus Rose on March 20, 1967, memorializing the results of these negotiations: (1) NBC would pay Rufus Rose $3,500.00 "in settlement of our past differences" and Rose would sign a general release; (2) Rose and Roger Muir would "arrange for the disposition of the various Howdy Doody puppets (except for 'HOWDY DOODY,' of course)"; (3) none of the puppets to be kept by Rose or Muir could be used commercially; and (4) Rose would inform Singer which puppets would be "going into the PUPPET MUSEUM," along with Howdy Doody.[28] It is clear from Singer's letter that even though these terms had been agreed to orally, he wished to set them out specifically in writing in the form of a counteroffer to Rose's written offer of June 3, 1966. In a March 23, 1967, letter, Rose accepted Singer's terms, indicated that he enclosed the signed general release, and stated that he would "at least" send Howdy Doody and the two other "main characters" to the DIA, Mr. Bluster and Dilly Dally.[29]

In addition to setting forth the terms of the agreement between Rufus Rose and NBC, these letters also show that the agreement was supported by consideration. As stated above, an exchange of promises is sufficient consideration to support a contract if the promises are capable of being performed. *See Osborne*, 218 A.2d at 530; *Lebowitz*, 253 A.2d at 6. Here, NBC paid Rufus Rose $3,500.00, permitted Rufus Rose and Roger Muir to keep the minor puppets from "The Howdy Doody Show," and agreed that Howdy Doody and the other main characters be given to the DIA. In return, Rufus Rose promised to comply with these terms and agreed to release NBC from any claims that he might have had against it concerning the storage and maintenance of the puppets since 1960. These commitments were all capable of being performed and therefore constitute valid consideration. Consequently, the 1966–1967 agreement was valid and enforceable.

The Rose defendants attempt to construe the contract as concerning only the parties' agreement as to the storage and maintenance fees and the "settlement of ... past differences," and argue that the language concerning the future of the puppets was not a subject of the contract. In particular, they point to the language of the general release, which does not discuss the future of the puppets, but instead mentions only the fire damage and payment for past storage and maintenance of the puppets. However, while the general release may have been so limited, the contract between the parties encompassed more than just the issues covered by the general release. The three letters show that the parties intended not only to resolve their past dispute over these charges, but also to resolve how the puppets would be handled in the future. This was an essential part of the agreement between Rufus Rose and NBC, not merely an afterthought or a separate topic from the contract. It also makes sense that the release only specifically mentioned the past dispute over the fire damage and the maintenance charges; that dispute was the subject of the of the Connecticut state court litigation, not the future disposition of the puppets.

The three letters also show that NBC was committed to assuring that Howdy

---

**27.** Written negotiations are evidenced by Singer's letters, dated November 15 and 21, 1966, in which he discusses the storage fee to be paid to Rufus Rose. Oral negotiations involving Singer and Roger Muir are also referenced in several of the letters.

**28.** Although this letter does not explicitly again state that Howdy Doody was to be

transferred to the DIA, that intent is clear when this letter is read together with Rufus Rose's letter of June 3, 1966, and Rufus Rose' subsequent letter of March 23, 1967.

**29.** These three letters are referred to in this opinion as the "1966–1967 agreement."

Doody be given to the DIA. As to the other puppets, Singer was not as concerned or as specific as to whether they were sent to the DIA or kept by Rose and Muir, so long as they were not commercially exploited and so long as NBC was informed by Rose as to their fate. However, it is clear from the letters that NBC specifically intended that the Howdy Doody puppet go to the museum. For example, the March 20, 1967, letter of Singer singles out Howdy Doody from the other puppets for the purpose of making clear that it would be sent to the DIA. Rose's intent, as expressed in his letters, was the same as to Howdy. There was a special significance and status of Howdy Doody, and the letters recognize it and deal with it.

### c. The DIA as Third Party Beneficiary

■ The evidence further shows that there is no genuine issue of material fact that the DIA was a third party beneficiary of the agreement between Rufus Rose and NBC. First, even though Singer, in his letter of March 20, 1967, does not specifically name the DIA as the "beneficiary," [30] his reference to the "Puppet Museum" indicates that he was describing and confirming his understanding of the entity to which Rufus Rose referred in his letter of June 3. [31] Second, while the defendants argue that the language of the March 20, 1967, Singer letter indicates that Howdy Doody is "excepted" from the agreement, when read in light of Rufus Rose' two letters to NBC described above, it is clear that Singer's statement does not except Howdy Doody from the puppets to be donated to the DIA, but instead excludes Howdy from the group of minor puppets to be kept by Rufus Rose and Muir to make sure that it would go to the DIA. Third, although it is not clear whether the DIA knew about the agreement at the time of its formation, the museum is now aware of the contract and has certainly accepted it or endorsed it by bringing this action to enforce it, which is all that is required. *See Data Gen. Corp., Inc.*, 502 F.Supp. at 785.

The interpretation of the third-party beneficiary arrangement between Rufus Rose and NBC is reinforced when the terms of the contract are considered in light of the circumstances attending the making of the contract, as well as the parties' motives. [32] *See Delacroix*, 993 F.Supp. at 83. The correspondence from NBC indicates that it was not only concerned with the past dispute with Rufus Rose and settling the future of the puppets, but also with commercial exploitation of all of the puppets from the show, especially Howdy Doody. The two "condi-

---

**30.** Moreover, a third-party beneficiary contract need not contain express language creating a direct obligation to the third party beneficiary to be valid. *See Grigerik*, 721 A.2d at 536.

**31.** With respect to their eighth affirmative defense, the Rose defendants argue that any obligation to deliver Howdy Doody was satisfied by Margo Rose's donation of Double Doody to the Smithsonian, or by her donation of other puppets to the Ballard Institute at the University of Connecticut. In support, they cite a 1979 letter from Margo Rose to Roger Muir as evidence of Margo's wish to make donations to these institutions. However, Margo Rose was not a party to the 1966–1967 agreement, and her intent therefore is irrelevant. They also refer to the deposition testimony of Muir, arguing that it indicates that Rufus and Margo Rose later decided against

donating Howdy Doody to the DIA. *See* Muir Dep. at 51–52. However, this does not alter the original agreement and the obligations that flow from it because there is no evidence that Rufus Rose and NBC entered into any agreement varying the terms of their original contract. *See* Restatement (Second) of Contracts § 311. Thus, the plaintiff is entitled to summary judgment with respect to the Rose defendants' eighth affirmative defense.

**32.** Although issues relating to intent are usually questions of fact for the jury, here the parties' intent to benefit the DIA is clear as a matter of law. In light of the circumstances attending the making of the contract and the parties' motives, "it is hard to see how the plaintiff could not have been an intended beneficiary of the contract." *Delacroix*, 993 F.Supp. at 83.

tions"[33] it placed on Rufus Rose—that all of the puppets not be used in a commercial manner and that Howdy Doody be displayed in a museum—show an intent to guard Howdy's image. NBC's apparent failure later to confirm delivery of the puppet to the DIA, or the fact that current NBC employees may not have been aware of this arrangement does not raise a genuine issue of material fact as to whether a contract existed. There is uncontested evidence of the intent of NBC—through Howard Singer's letters—at the time of the contract.[34]

Rufus Rose' letters evidence a motivation similar to that of NBC. As Howdy Doody's primary caretaker, he was the first to propose sending the puppet to the DIA. This shows his selfless desire to preserve Howdy Doody in a public place he considered to "house[ ] the recognized museum of Puppetry in America," so that future generations could still see and enjoy Howdy Doody, rather than keep the puppet for his own profit.

### d. Time of Performance

■ The Rose defendants argue that no document required Rufus Rose to turn over Howdy Doody to the DIA, an argument which suggests that the contract may suffer from a lack of certainty as to the time when Rufus Rose was to turn Howdy Doody over to the DIA, which would be fatal to the agreement and to DIA's status as third party beneficiary. In the alternative, they argue that this language is ambiguous and as a result, presents a question of fact for a jury.

Although the language of the contract suggests that the parties intended that the transfer occur some time in the future,[35] the parties did not specify the time of such performance. As stated above, the failure of contracting parties to specify the time of performance does not necessarily render the contract unenforceable; instead, the trier of fact ordinarily determines a reasonable time under the circumstances when the time of performance is not stated. *See Northeast Elec.*, 469 A.2d at 420; *Schlicher*, 752 A.2d at 521 *Christophersen*, 582 A.2d at 463. Here, however, the implied term of a reasonable time for performance is no longer a question of fact for a jury. Rufus Rose promised that *he* would send Howdy Doody to the DIA, and he did not do so within his lifetime. In addition, no reasonable jury could conclude that a reasonable time for performance has not passed; the contract was made thirty-three years ago and certainly Howdy Doody should have been transferred to the DIA by now. While a jury could conclude that it would have been reasonable for Rufus Rose to fulfill his promise to give Howdy Doody to the DIA some time after the contract was made, no reasonable jury could find that a reasonable time for.this transfer is after Rufus Rose and Buffalo Bob had passed away or after the start of the new millennium. As a result, a reasonable time has elapsed as a matter of law.

■ It might also be argued that the 1966–1967 correspondence between Rufus Rose and NBC is ambiguous, rather than silent, as to time of performance. In

**33.** Although the parties often refer to these provisions as "conditions," they are actually terms of the contract. *See* Corbin, Contracts § 30.6 (1966).

**34.** It is not surprising that NBC did not pay great attention to Howdy Doody and the other puppets after the 1966–1967 agreement was completed. Because of that agreement, NBC believed that all of the puppets were either going to the DIA or were to be kept by Rose and Muir, but not to be used commercially. NBC was not going to receive any of the puppets, so once their future had been decided NBC's involvement was concluded.

**35.** For instance, in the June 3, 1966 letter, Rufus Rose refers to the "final disposition" of the puppets, including Howdy Doody. In his letter of March 20, 1967, Singer asks to be informed which puppets (along with Howdy Doody) "will be going" to the DIA. Similarly, Rose, in his letter of March 23, 1967, states that he "will suggest" to the DIA that it take Howdy Doody and two other puppets.

other words, "final disposition" in Rose's first letter could be interpreted as addressing this element of the contract, making the time when Rufus Rose was to turn over the puppet to the DIA unclear, and requiring additional evidence to be considered by a jury on this term. However, even if this were the case, there has been no evidence presented that NBC or Rufus Rose intended such delivery to occur later than Rose's death or the death of Buffalo Bob. The same reasoning applies to any claim that the 1966–1967 agreement between NBC and Rufus Rose was subsequently modified by the parties; there has been no evidence presented that NBC and Rose agreed that the contract was modified to permit delivery later than those deaths.

### e. Rufus Rose's Claims of Ownership and Other Matters

Rufus Rose's characterization of his interest in the puppet after the 1966–1967 agreement with NBC also does not alter the conclusion that the puppet should be transferred to the DIA. The Rose defendants point to statements made by Rufus Rose and others that describe his interest in Howdy Doody as ownership. For instance, in his 1970 letter to Buffalo Bob, Rufus Rose stated that NBC conveyed to him "*ownership* of all the Howdy Doody marionettes ... with the provision that Howdy himself eventually be placed in the

care of the Detroit Institute of Arts" (emphasis added). However, this description three years after the agreement with NBC does not alter Rose's obligation under that agreement or his rights to Howdy Doody. Moreover, Rufus Rose was not a lawyer and, more important, even though he used the word "ownership" as to all the puppets (including Howdy Doody) in the letter, it is clear from the rest of the letter and other documents that he well understood and supported his obligation to turn Howdy Doody over to the DIA; he knew and accepted that Howdy Doody was not his to keep.[36] There has been no contrary evidence presented.[37]

The fact that the Rose family was in possession of Howdy Doody after the puppet was returned by Buffalo Bob also does not defeat the DIA's claim of ownership. *See Hall v. Schoenwetter*, 239 Conn. 553, 686 A.2d 980, 985 (1996) ("It has long been a principle of common law that the party in possession [of property] is regarded by the law as the owner, except in a contest with one who has true title."). In this case, the DIA is the owner based upon the 1966–1967 agreement, and the fact that the Rose family possessed Howdy Doody for a number of years does not defeat the DIA's claims of ownership.[38]

### f. Conclusion

In sum, given the language of the contract, its surrounding circumstances, the

**36.** The other evidence cited by the Rose defendants in their supplemental memorandum as support for Rufus Rose's claim of ownership, even if admissible, does not alter this conclusion.

**37.** In arguing that Rufus Rose was the owner of Howdy Doody, the defendants suggest that NBC may have abandoned not only the 1966–1967 agreement, but Howdy Doody itself, given that NBC failed to reclaim the puppet after many years. Rufus Rose and NBC did have the power to discharge the contract (in effect, abandoning it) or alter its terms with a subsequent agreement before the DIA relied or commenced a suit on it. But, there is no evidence that they did so. Also "[a]bandonment of personal property ... requires an intention to abandon or relinquish accompanied by some act or omission to act by which

such an intention is manifested." *Sanchez v. Forty's Texaco Serv., Inc.*, 5 Conn.App. 438, 499 A.2d 436, 437 (1985) (citing *Sharkiewicz v. Lepone*, 139 Conn. 706, 96 A.2d 796, 797 (1953)). Here, there is no evidence indicating that NBC acted in a way that demonstrated an intent to abandon Howdy Doody in favor of Rufus Rose or Buffalo Bob.

**38.** The Rose defendants also note in their supplemental memorandum that under the Uniform Commercial Code title passes at the time and place at which the seller delivers possession of the goods. *See Conn. Gen.Stat.* § 42a–2–401(2). However, none of the parties contends that the 1966–1967 contract between Rufus Rose and NBC constituted a sale of goods. Therefore, this provision does not apply to the current dispute.

undisputed evidence of intent, and the implied term for time of performance, the agreement between Rose and NBC is unambiguous as to the DIA's interest in Howdy Doody. *See Sharkey*, 70 F.3d at 230; *Orange Improvements Partnership*, 984 F.Supp. at 89. As a result, there is insufficient evidence to support the defendants' claim that the DIA was not a third party beneficiary,[39] and the plaintiff has produced sufficient evidence to demonstrate that there is no genuine issue of material fact that it is the owner of the Howdy Doody puppet at issue in this case based upon its rights as a third party beneficiary to the 1966–1967 contract between Rufus Rose and NBC.[40]

### 3. Agreement between Rufus Rose and Buffalo Bob

The plaintiff argues that the 1970 letter agreement between Rufus Rose and Buffalo Bob is enforceable as a gratuitous bailment, and that Buffalo Bob was required to turn over Howdy Doody to the DIA. The defendants argue that this agreement is unenforceable as a contract or as a bailment because it lacks consideration and does not explicitly direct Buffalo Bob to turn over Howdy directly to the DIA. They further contend that even if enforceable, the 1970 letter agreement did not obligate Buffalo Bob to give Howdy Doody to the DIA.

### a. Applicable Bailment Law

▮ A bailment arises when the owner or bailor "delivers personal property to another for some particular purpose with an express or implied contract to redeliver the goods when the purpose has been ful-

filled, or to otherwise deal with the goods according to the bailor's directions." *B.A. Ballou & Co.*, 591 A.2d at 129 (quoting *Maulding v. United States*, 257 F.2d 56, 60 (9th Cir.1958)). The bailor has a property interest in the goods bailed, while the bailee merely possesses them. *Id.* The bailee's possession must be exclusive, so that he or she has sole custody and control of the property. *See Ferrucci v. Atlantic City Showboat, Inc.*, 51 F.Supp.2d 129, 134 (D.Conn.1999).

▮ There are two types of bailments: those that are for the mutual benefit of the parties involved and those that are for the sole benefit of either the bailee or bailor. *See Hartmann v. Black & Decker Manuf. Co.*, 16 Conn.App. 1, 547 A.2d 38, 42 (1988). The latter variety, known as gratuitous bailments, typically involve no actual consideration. *See Elliotte v. Automated Material Handling, Inc.*, No. CV 90–0438110S, 1990 WL 283127, *1 (Conn.Super.Ct. Oct. 22, 1990). Instead, it is enough that the bailor suffers a detriment by giving up the present possession or custody of the property bailed on the bailee's promise that the latter will redeliver or otherwise account for it. *See* 8A Am.Jur.2d Bailments § 32 (1997); *cf. Johnson v. H.M. Bullard Co.*, 95 Conn. 251, 111 A. 70, 71 (1920) ("Where property is loaned gratuitously by the owner for the sole benefit, accommodation and use of the borrower, and the specific thing loaned is to be returned, a gratuitous bailment relation is created." (internal quotation omitted)).

Bailments involve certain implied obligations,[41] but these obligations generally

---

**39.** Even if the 1966–1967 agreement was deficient or ineffective, the defendants would not be the owners of the Howdy Doody puppet. There is no question that NBC became the owner of the puppet through its contract with Velma Dawson in 1948, and the defendants have not presented evidence that NBC ever transferred ownership of the puppets to Rufus Rose after that. Thus, if the 1966–1967 agreement was of no effect, NBC would still own the puppet and NBC has indicated that it still wishes that it be given to the DIA.

**40.** This finding also disposes of plaintiff's motion for summary judgment on the defendants' sixth affirmative defense as to lack of consideration.

**41.** Implied obligations related to the parties' duty of care vary depending on whether the bailment is for the parties' mutual benefit or

are implied only in the absence of an express provision to the contrary. *See On Site Energy Corp. v. Sperry Rand Corp.*, 5 Conn.App. 326, 498 A.2d 121, 124 (1985) (quoting *Douglass v. Hart*, 103 Conn. 685, 131 A. 401, 402 (1925)). For example, while the law of bailment implies a general obligation to redeliver the property bailed to the owner, the parties are able to stipulate the time, place and manner of delivery. *See id.* at 124. "The general principle that the manner of a bailee's redelivery should be in accordance with the contract stipulations is too well settled to belabor." *Id.* Similarly, a bailee may become liable to a third party when the bailment contract includes provisions that were incorporated for the third party's special benefit and interest. *See* 8A Am.Jur.2d Bailments § 167.

b. The Bailment in This Case

■ The evidence establishes that Rufus Rose's 1970 letter to Buffalo Bob created an enforceable bailment whereby Buffalo Bob assumed a duty to turn over Howdy Doody to the DIA. The evidence does not support the defendants' argument or raise a genuine issue of material fact that Buffalo Bob was not bound to deliver Howdy Doody to the DIA. As a result, the plaintiff is entitled to summary judgment on this issue.

Rufus Rose delivered Howdy Doody to Buffalo Bob with an express term of the bailment that Buffalo Bob would be allowed to possess Howdy Doody "for as long as [he] personally wish[ed] to have him," but specifically conditioned Buffalo Bob's use on the same two requirements that NBC imposed upon Rufus Rose: that Howdy Doody would not be used in a commercial manner and that the puppet would "eventually be placed in the care of The Detroit Institute of Arts." These statements indicate that the bailment was express, and that Buffalo Bob, as bailee,

was bound to deal with Howdy Doody according to the instructions of Rufus Rose, the bailor. *See B.A. Ballou & Co.*, 591 A.2d at 129.

■ The defendants first argue that this agreement between Rufus Rose and Buffalo Bob is unenforceable as a bailment because it lacks consideration. However, actual consideration is not required for a bailment to be enforceable. *See* 8A Am. Jur.2d Bailments § 32. As stated above, gratuitous bailments are generally not supported by actual consideration, but are still binding on the bailee. *See Elliotte*, 1990 WL 283127, at *1. Here, it appears that the bailment was gratuitous: it was undertaken for the sole benefit of one of the parties, in this case, the bailee, Buffalo Bob. Thus, it is enough that Rufus Rose, as bailor, gave up custody of Howdy Doody based upon Buffalo Bob's promise that he would redeliver the puppet. *See Johnson*, 111 A. at 71. As a result, the bailment agreement between Rufus Rose and Buffalo Bob is enforceable without actual consideration.

■ The defendants maintain that the 1970 agreement between Rose and Smith was satisfied by his return of Howdy Doody to the Smith family in 1998. They also argue that the 1966–1967 agreement is satisfied by "eventually" giving the puppet to the DIA. In other words, other members of the Rose or Smith family may keep the puppet so long as one day it is turned over to the DIA. However, these interpretations of Rufus Rose' words are unsupported by the language of the bailment letter itself; it states that the puppet could only be kept by Smith "personally" and does not mention that the puppet could be passed along by Buffalo Bob after the death of Rufus Rose to anyone else, other than giving it to the DIA. Also, delaying delivery of Howdy Doody through the latter interpretation would undermine

whether it is gratuitous. *See Hartmann*, 547 A.2d at 41–42. Certain duties of parties to gratuitous bailments also vary depending

upon which party benefits from the arrangement. *See id.* at 42 n. 4.

the terms of the 1966–1967 agreement between Rufus Rose and NBC: it would allow Howdy to be passed indefinitely, perhaps never to be sent to the DIA.[42]

Thus, the defendants have not shown that they are entitled to summary judgment on the issue of Buffalo Bob's 1970 agreement with Rufus Rose. Instead, the plaintiffs have shown that there is no genuine issue of material fact that the DIA is entitled to possession of Howdy Doody based on the agreement between NBC and Rufus Rose from 1966–1967 and the obligations of Buffalo Bob under the Rufus Rose–Buffalo Bob agreement from 1970.[43]

### B. Affirmative Defenses [44]

The DIA argues that defendants' remaining affirmative defenses are not supported by sufficient evidence and, as a result, it is entitled to summary judgment on those as a matter of law. Each will be considered below.

### 1. Laches

■■■ Under the doctrine of laches, a plaintiff's claim is barred when there is "unreasonable, inexcusable, and prejudicial delay in bringing suit." *See Cummings v. Tripp*, 204 Conn. 67, 527 A.2d 230, 240–41 (1987) (quoting *Schomer v. Shilepsky*, 169 Conn. 186, 363 A.2d 128, 133 (1975)). The burden is on the party alleging laches to establish this defense. *See id.* Summary judgment is appropriate when the nonmoving party fails to make a sufficient showing of an essential element of its case for which it has the burden of proof. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A party opposing summary judgment also may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civil. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.* Here, although the defendants assert laches as an affirmative defense, they have produced no evidence indicating that any delay by the plaintiff was prejudicial to them. Therefore, there is no genuine issue of material fact that the delay was not prejudicial, and the plaintiff is entitled to summary judgment as a matter of law on this defense.

### 2. Statute of Wills

■■■ "A will is the legal declaration of intention as to the disposition of one's property after death." *Barnes v. Viering*, 152 Conn. 243, 206 A.2d 112, 113 (1964) (quoting *Jacobs v. Button*, 79 Conn. 360, 65 A. 150, 151 (1906)). "A will is ordinarily without valuable consideration and lacks the element of present-existing contractual rights." *Faggelle v. Marenna*, 131 Conn. 277, 38 A.2d 791, 792 (1944) (holding that an agreement supported by mutual promises to perform did not constitute a will). Instead, a will creates an interest that arises at death, *see Bowen v. Morgillo*, 127 Conn. 161, 14 A.2d 724, 727 (1940), and must contain language indicating that a testamentary gift is intended. *See Barnes*,

---

**42.** As to whether the Smith Estate may be liable in damages for not delivering the puppet earlier to the DIA, the Court does not reach that issue at this time. The foregoing discussion only holds that the 1970 bailment agreement requires the delivery of the puppet to the DIA at this time.

**43.** In addition, as to their seventh affirmative defense, the defendants argue that Rufus Rose's agreement to turn over Howdy Doody to the DIA did not constitute a gift. However, as the plaintiff points out, the DIA never alleged that such a gift was made. Moreover, given that Rufus Rose was under a contractual obligation to place Howdy Doody in the possession of the DIA, this issue is not material to the Court's decision on summary judgment. This disposes of the defendants' seventh affirmative defense.

**44.** Several of the affirmative defenses raised by the defendants have been addressed in Section III.A. This section will discuss the remaining defenses raised by the plaintiff in its motion for summary judgment.

206 A.2d at 113. Under the Statute of Wills, Conn. Gen Stat. § 45a–251, a will executed in Connecticut is not valid unless it is in writing, subscribed by the testator, and attested by two witnesses, each of them subscribing in the testator's presence. Certain of these formal requirements were not part of the 1966–1967 agreement.

The defendants argue that any promise made by Rufus Rose as to the disposition of the Howdy Doody puppet in the 1966–1967 agreement was intended to take effect after his death and that such a promise would violate the Statute of Wills. As evidence, they point to: (1) Rufus Rose's use of the term "final disposition" when referring to his plan to turn Howdy over to the DIA in his June 3, 1966, letter to Schmitt; and (2) the lack of any definite date in Rufus Rose's 1970 letter to Buffalo Bob as to when he was to give Howdy Doody to the DIA.[45] However, the agreement at issue in this case-comprised of the 1966–1967 correspondence-does not condition its operation on the death of any party. The transfer of Howdy Doody to the DIA could have occurred at any time, and Rufus Rose's promise to turn over Howdy to the DIA was capable of being performed before his death. Further, the 1966–1967 agreement was supported by consideration. *See Faggelle*, 38 A.2d at 792. The 1966–1967 agreement thus cannot be considered a will or any other testamentary instrument, and therefore, does not violate the Statute of Wills.[46]

3. Statute of Frauds

■ Under the Statute of Frauds, Conn. Gen.Stat. § 52–550(a)(5), a civil action may not be maintained unless the agreement at issue, if not able to be performed within one year from the time of making, is in writing. Here, both the 1966–1967 agreement between Rufus Rose and NBC and the 1970 agreement between Rufus Rose and Buffalo Bob could have been performed within one year: Rufus Rose could have given Howdy to the DIA within a year of his sending the last letter to Singer, and Buffalo Bob similarly could have given the puppet to the museum within a year after Rufus Rose sent it to him. The defendants have produced no evidence to the contrary. Therefore, neither agreement violates the Statute of Frauds and the plaintiff is entitled to summary judgment on this issue.[47]

IV. Conclusion

The plaintiff's motion for partial summary judgment is GRANTED. Claims two through seven, which request damages, are reserved for trial. The Rose defendants' motion for summary judgment is DENIED based on the foregoing discussion. As to the DIA's claim of tortious interference with contract, there exist genuine issues of material fact, such as whether Christopher Rose intended to interfere with a contractual relationship, whether his alleged interference was tortious, and whether the DIA suffered actual loss as a result.

The Smith estate's motion for summary judgment is DENIED. That portion of the motion which is the same as that of the Rose defendants' is denied for the same reasons; as to the additional arguments, genuine issues of material fact exist.[48]

---

**45.** The Rose defendants actually raise these evidentiary points in their argument that Rufus Rose's promise to the DIA was not a gift.

**46.** The defendants also suggest that Howdy Doody became property of the Rose Family Trust when Buffalo Bob died because Buffalo Bob was not obligated to deliver the puppet to the DIA on any particular date. However, given that the bailment relationship between Buffalo Bob and Rufus Rose required Smith to give Howdy Doody to the DIA, this position is unavailing as a matter of law.

**47.** Even if the agreement between Rufus Rose and NBC was unable to be performed within a year, and thus fell within the Statute of Frauds, the Statute is satisfied because the agreement was in writing.

**48.** As to all defendants, the remaining claims include conversion (claim two), civil theft

For example, it is not clear whether the Smith estate or Buffalo Bob possessed the requisite intent to be liable for civil theft, or whether they deprived the DIA of ownership of Howdy Doody to an extent sufficient to hold it liable for conversion. In addition, genuine issues of material fact exist as to whether Buffalo Bob engaged in trade or commerce under CUTPA, and if his actions constituted a breach of any contract.

## V. Summary

The DIA has shown that it is the owner of the Howdy Doody puppet as a matter of law. It was a third party beneficiary of the contract between Rufus Rose and NBC from 1967. The clear intent of Rufus Rose and NBC, as expressed in that contract, was that the puppet be placed in the museum. Although there may be a question as to whether this Howdy Doody puppet was exactly the same in 1960—after the wear and tear of over two thousand shows—as it was when first created in 1948, there is no question that the puppet now in the Rhode Island bank and subject to this case is the same that existed at the end of the show and the same that was the subject of the agreement between Rufus Rose and NBC in 1967.

It is so ordered.

(claim three), violation of the Connecticut Unfair Trade Practices Act (claim five), and breach of contract (claim seven). An additional claim of tortious interference with contract (claim four) remains as to Christopher Rose, and an additional count of breach of contract (claim six) remains as to the Smith estate.